[No. 55611-3.   En Banc.   May 11, 1989.]

JOHN B. WINANS, ET AL, *Respondents,* v. W.A.S., INC., ET AL, *Petitioners.*

530

*Culp, Guterson & Grader,* by *Richard C. Yarmuth* and *Robert M. Sulkin,* for petitioners.

*Williams, Kastner & Gibbs,* by *Scott B. Henrie* and *Elizabeth A. Christianson,* for respondents.

UTTER, J.—W.A.S., Inc., d/b/a Henry's Off Broadway Restaurant (Henry's), seeks review of a Court of Appeals decision affecting the payment method for their parking valets. The Court of Appeals upheld the Superior Court which ruled that the 1974 amendments to the federal Fair Labor Standards Act (FLSA) render illegal a payment scheme in which the tips received by the valets become the employer's property and are used to fulfill the employer's minimum wage obligations. *Winans v. W.A.S., Inc.,* 52 Wn. App. 89, 758 P.2d 503 (1988). We granted discretionary review and now affirm the Court of Appeals.

Henry's is located in Seattle's Capitol Hill neighborhood. Because parking in Capitol Hill is rather difficult, Henry's employs a number of valets to handle the customers' search for a parking spot. During the course of their work, the valets receive tips from the customers. Under an agreement between Henry's and the valets, which is a condition for the valets' employment, all of these tips become the property of Henry's. Henry's uses this tip money to pay the valets at rates of $4.50 to $6 per hour. In addition to fulfilling these wage obligations, the tip money is also used to cover payroll tax, insurance deductibles, and other expenses. Any surplus is given back to the valets as a bonus.

On June 15, 1983, John B. Winans, Jay A. Bailet, Paul Cottle, John Kelly, Craig Mullarky, and Randy Rupert, all valets at Henry's, filed an action against the restaurant in

King County Superior Court. They alleged that the payment agreement described above violated federal and state minimum wage laws. In particular, they argued that the 1974 amendments to the FLSA made such arrangements illegal. The valets also sought liquidated damages under the FLSA—which would effectively double the amount of their award—and attorney fees and costs. The case initially went to arbitration; the arbitrator held in favor of the valets. Henry's then requested a bench trial.

Judge Robert M. Elston of the Superior Court for King County held as a matter of law that the payment agreement was illegal. Report of Proceedings (Dec. 12, 1986), at 1–7. Nonetheless, because the court found Henry's had not created the payment scheme in bad faith, the valets were not entitled to liquidated damages. The court did, however, award attorney fees and costs to the plaintiffs.

Henry's appealed the trial court decision to the Court of Appeals. The valets cross–appealed on the issue of liquidated damages. The Court of Appeals affirmed the trial court, including its award of fees and costs, with one judge dissenting. In addition, the majority awarded further fees and costs to the plaintiffs for the appeal. A concurring/dissenting opinion found that liquidated damages would have been appropriate. A third judge, in dissent, would have reversed the trial court, arguing that the FLSA amendments did not clearly render the payment agreement illegal.

At this court, Henry's raises the same issues as it did below; it does not, however, raise any issues regarding state minimum wage laws. The valets again seek review of the liquidated damages issue.

I

In arguing that the Court of Appeals was incorrect, petitioners contend that the FLSA "expressly permits" two kinds of employee payment schemes when the employees receive tips: the "tip credit method" and the "hourly wage method." Under the former system, the employees keep all the tips they receive but the employer may deduct up to 40

percent of the employees' hourly minimum wage. Under the latter, the tips received by the employees are the property of the employer, who must pay the full minimum wage. The employees turn over the tips they receive to the employer, who uses them to pay wages and other expenses. Henry's used this latter system to pay the valets.

Henry's argues that provisions in the Code of Federal Regulations promulgated in 1967 specifically provide for the "hourly wage method." The relevant portions of these provisions are as follows:

> In the absence of an agreement to the contrary between the recipient and a third party, a tip becomes the property of the person in recognition of whose service it is presented by the customer.

29 C.F.R. § 531.52.

> [W]here the employment agreement is such that amounts presented by customers as tips belong to the employer and must be credited or turned over to him, the employee is in effect collecting for his employer additional income from the operations of the latter's establishment. . . . [T]he employee is not receiving tips within the meaning of section 3(m) and 3(t). The amounts received from customers are the employer's property, not his, and do not constitute tip income to the employee.

29 C.F.R. § 531.55(a).

> As indicated in § 531.51, the tip credit may be taken only for hours worked by the employee in an occupation in which he qualifies as a "tipped employee." Under employment agreements requiring tips to be turned over or credited to the employer to be treated by him as part of his gross receipts, it is clear from the legislative history that the employer must pay the employee the full minimum hourly wage, since for all practical purposes the employee is not receiving tip income.

29 C.F.R. § 531.59.

The parties concede that prior to 1974 the type of arrangement used by Henry's was legal. Such agreements were upheld in *Williams v. Jacksonville Terminal Co.,* 315 U.S. 386, 86 L. Ed. 914, 62 S. Ct. 659 (1942), and *Hodgson*

*v. Bern's Steak House, Inc.*, 20 Wage & Hour Cas. 261 (M.D. Fla. 1971). Respondents contend, however, that the amendments made to the FLSA in 1974 render the above regulations invalid and the "hourly wage method" along with it. The relevant statute, as amended, reads in part:

In determining the wage of a tipped employee, the amount paid such employee by his employer shall be deemed to be increased on account of tips by an amount determined by the employer, but not by an amount in excess of [40] per centum[1] of the applicable minimum wage rate, except that the amount of the increase on account of tips determined by the employer may not exceed the value of tips actually received by the employee. The previous sentence shall not apply with respect to any tipped employee unless (1) such employee has been informed by the employer of the provisions of this subsection, and (2) *all tips received by such employee have been retained by the employee,* except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.[2]

(Italics ours.) 29 U.S.C.A. § 203(m) (Supp. 1988). The statute further defines "tipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C.A. at § 203(t). Congress added this definition to the statute in 1966, originally with $20 as the determinative amount. Pub. L. No. 89–601, 80 Stat. 830 (1966).

---

[1]As amended in 1974, § 203(m) allowed employers to take a 50 percent tip credit.

[2]Prior to the 1974 amendment, the relevant portion of § 203(m) read: "In determining the wage of a tipped employee, the amount paid such employee by his employer shall be deemed to be increased on account of tips by an amount determined by the employer, but not by an amount in excess of 50 per centum of the applicable minimum wage rate, except that in the case of an employee who (either himself or acting through his representative) shows to the satisfaction of the Secretary that the actual amount of tips received by him was less than the amount determined by the employer as the amount by which the wage paid him was deemed to be increased under this sentence, the amount paid such employee by his employer shall be deemed to have been increased by such lesser amount." Pub. L. No. 89–601 § 101(a), 80 Stat. 830 (1966).

Essentially, the valets argue that the definition of "tipped employee" in § 203(t) in conjunction with the requirement that "all tips received by such [tipped] employee have been retained by the employee" nullify the prior legality of the "hourly wage method." Under their reasoning, any employee who receives over $30 per month in tips must, under the statute, keep the tips and receive at least 60 percent of the minimum wage. Further, if the notice requirements of § 203(m) are not met, then the employer must pay all of the minimum wage. The "hourly wage method" takes the tips away from the employees and, by denominating them as the employer's property, allows the employer to pay less out of his own pocket to meet the minimum wage requirement. Thus, the employer gains a greater "tip credit" than otherwise allowed by § 203(m).[3]

Petitioners, on the other hand, maintain that § 203(m) applies only to the possible tip credit allowed to employers of "tipped employees." They claim that, under the regulations, employees under a tip agreement like the one here are not "tipped," therefore, § 203(m) does not apply to the valets at all. In essence, they argue that the 1974 amendments did not change the arrangements recognized by the regulations because the amendments did not explicitly overrule the regulations. Thus, the regulations' exception to "tipped employee" remains.

The central issue in this case, then, is whether or not the regulations cited by the petitioners are still valid. The valets argue for their invalidity because they are inconsistent with the 1974 amendments. They cite two administrative decisions of Department of Labor Wage–Hour Administrators which explicitly find the regulations invalid. In Wage and Hour Op. Letter WH–310 (Feb. 18, 1975), Administrator Murphy found:

---

[3]Henry's covered all of the valets' wages out of tip money. Moreover, because the tip money was also used to cover additional expenses, Henry's technically took a greater than 100 percent "tip credit."

The interpretations prescribed in 29 CFR 531.50 through 531.60 were issued pursuant to the Act as it was before the 1974 amendments, and have no effect to the extent that they are in conflict with the amended Act. Revisions of these CFR sections are being prepared which will incorporate the changes resulting from the 1974 amendments.

The new regulations never came out. See also Wage and Hour Op. Letter WH–321 (Apr. 30, 1975).

The valets also point to the legislative history of the 1974 amendments as evidence of Congress's intent to make the "hourly wage method" illegal. In particular, the valets cite S. Rep. No. 690, 93d Cong., 2d Sess. 42 (1974) (hereinafter S. Report). The report describes the amendment as "mak-[ing] clear the original Congressional intent that an employer could not use the tips of a 'tipped employee' to satisfy more than 50 percent of the Act's applicable minimum wage." S. Report, at 43. This statement may be directed in part at the regulations' treatment of "tipped employees": the Act itself only defines a "tipped employee" as one who receives a certain amount of tip income each month; it contains no qualification of its own. The qualification comes only from the regulations. The same Senate Report cites the definition of "tip" found in 29 C.F.R. § 531.52, conspicuously omitting the qualification regarding the "hourly wage method" quoted above:

> A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for him. It is to be distinguished from payment of a charge, if any, made for the service. Whether a tip is to be given, and its amount, are matters determined solely by the customer, *and generally he has the right to determine who shall be the recipient of the gratuity.*

(Italics ours.) S. Report, at 42. The legislative history, then, reinforces the plain and simple definition of "tipped employee" that one reads in the statute: one who receives over a certain sum each month in "tips"—money given directly to him at the customer's discretion.

In response, petitioners repeatedly point out that the regulations in question are still found in the Code of Federal Regulations, some 15 years after the amendments to § 203(m) were made. They argue that the administrative opinions upon which the valets rely do not have the force of law equal to that of the regulations. Therefore, the opinions cannot "overrule" the regulations. Petitioners cite a number of cases for the proposition that when administrative opinions are inconsistent with the Code of Federal Regulations, they have no effect: *Chrysler Corp. v. Brown,* 441 U.S. 281, 60 L. Ed. 2d 208, 99 S. Ct. 1705 (1979); *Udall v. Tallman,* 380 U.S. 1, 13 L. Ed. 2d 616, 85 S. Ct. 792, *reh'g denied,* 380 U.S. 989 (1965); *Batterton v. Marshall,* 648 F.2d 694 (D.C. Cir. 1980); *Siomkin v. Fairchild Camera & Instrument Corp.,* 174 F.2d 289 (2d Cir. 1949).

These cases are not directly on point. *Udall* dealt with the effect of the Secretary of Interior's interpretations of executive orders; the United States Supreme Court's analysis focused on the deference given to the Secretary. The only language relevant to the present case is this: "[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" 380 U.S. at 16–17, quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 89 L. Ed. 1700, 65 S. Ct. 1215 (1945). The present case is not within the scope of this statement: at issue are not administrative opinions inconsistent with the regulations, but opinions that explicitly state that the old regulations are no longer valid in light of changes in the statute.

Petitioners' other cases, when read together, actually work against them. *Brown* does state explicitly that "substantive regulations" have the force of law. 441 U.S. at 295. *Batterton,*[4] however, points out the distinction between

---

[4]*Batterton* did not directly address the issue whether administrative opinions have weight equal to legislative regulations. Instead, it dealt with new methods used by the Department of Labor for compiling unemployment statistics. The

legislative and substantive regulations on the one hand, and interpretive regulations on the other. The latter category can be persuasive to a court upon review, but does not carry the force of law as does the former. 648 F.2d at 701–02. *See also GE Co. v. Gilbert,* 429 U.S. 125, 50 L. Ed. 2d 343, 97 S. Ct. 401 (1976); *Batterton v. Francis,* 432 U.S. 416, 53 L. Ed. 2d 448, 97 S. Ct. 2399 (1977); 2 K. Davis, *Administrative Law* § 7.8 (1979).

These cases, then, beg the question whether the regulations at issue here are substantive or interpretive. That question is answered in the heading for subpart C of 29 C.F.R. § 531 specifically identifies the subsequent regulations as "interpretations." The introductory statement declares:

> (a) The ultimate decisions on interpretations of the Act are made by the courts. . . .
> (b) The interpretations of the law contained in this subpart are official interpretations of the Department of Labor with respect to the application under described circumstances of the provisions of law which they discuss. The interpretations indicate, with respect to the methods of paying the compensation required by sections 6 and 7 and the application thereto of the provisions of section 3(m) [29 U.S.C. § 203(m)] of the Act, the construction of the law which the Secretary of Labor and the Administrator believe to be correct and which will guide them in the performance of their administrative duties under the Act unless and until they are otherwise directed by authoritative decisions of the courts or conclude, upon reexamination of an interpretation, that it is incorrect. . . .

29 C.F.R. § 531.25. Because the regulations are interpretive, they do not have the force of law attributed to them by petitioners. Moreover, the administrative opinions at issue here constitute a "reexamination of an interpretation" in

---

court found that these new methods were actually legislative rules and thus required Administrative Procedure Act notice and comment procedures for their promulgation. The court specifically stated that interpretive rules did not require such procedures. 648 F.2d at 701.

light of statutory changes. Thus, the previous interpretations of a statute which no longer exists are now "incorrect."

*Siomkin v. Fairchild Camera & Instrument Corp., supra,* dealt with the authority of the Wage and Hour Administrator's "Interpretive Bulletin" expressing his "enforcement policy." The court held that it did not have the force of law as such. Petitioners quote the opinion by Judge Learned Hand: "The Administrator has not the power to issue regulations in the ordinary sense, and his "Bulletins" have not the force of law . . ." 174 F.2d at 292. Petitioners fail, however, to include the concluding phrase of Judge Hand's sentence: "though they should be deemed to have the authority of an administrative interpretation."

Although it is not entirely clear what the judge meant by regulations in the "ordinary sense," in the context of the opinion, it is likely that the reference was to substantive regulations having the force of law. The statute creating the office of Wage and Hour Administrator does not delegate the power to the Administrator to issue substantive regulations. On the contrary, it directs the Administrator to report to Congress on the need to update legislation when needed, further implying that he or she does not have law*making* authority. *See* 29 U.S.C. § 204. In this light, the interpretive regulations relied on by Henry's may have the same force of authority as the bulletin described by Judge Hand. They are interpretations of the statute, nothing more or less. Because of this status, subsequent restatements of opinion in administrative opinions should have equal force, especially when they follow an amendment to the statute.

Henry's argues, however, that in order to change the "status quo," Congress must announce the change "explicitly" and "unmistakably." They maintain that Congress was aware of the regulations allowing for the "hourly wage method" and in order to overrule them, Congress must make an explicit statement to that effect. They cite *Sierra Club v. Secretary of the Army,* 820 F.2d 513 (1st Cir. 1987);

*Bush v. Oceans Int'l,* 621 F.2d 207 (5th Cir. 1980); *In re Marriage of Naval,* 43 Wn. App. 839, 719 P.2d 1349 (1986); and *State v. Calderon,* 102 Wn.2d 348, 684 P.2d 1293 (1984).

None of the cases relied on, however, dealt with the effect of an amended statute on interpretive regulations promulgated pursuant to the statute's old version. *Sierra Club* dealt with the effect the reenactment of a statute—with the substantive portions unchanged—on previous interpretations of its provisions. The court stated: "a substantial reenactment of the law *incorporating its preexisting phraseology* is usually the functional equivalent of codifying the earlier construction into the statute." (Italics ours.) 820 F.2d at 522. *Bush* concerned the laches doctrine judicially appended to a negligence action brought against a maritime defendant. The court held that the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act did not "jettison the admiralty principles of laches . . ." 621 F.2d at 211. *Naval* and *Calderon* similarly concerned the need for an explicit legislative statement to make changes in the common law. 43 Wn. App. at 843–44; 102 Wn.2d at 351.

■ The effect of statutory changes on regulations promulgated solely to interpret previous versions of the statute is an entirely different matter. Petitioners essentially would have the tail wag the dog. A different rule of law applies here: "regulations, in order to be valid, must be consistent with the statute under which they are promulgated." *United States v. Larionoff,* 431 U.S. 864, 873, 53 L. Ed. 2d 48, 97 S. Ct. 2150 (1977). Regulations which operate out of harmony with the statute have no effect. *Manhattan Gen. Equip. Co. v. Commissioner,* 297 U.S. 129, 134, 80 L. Ed. 528, 56 S. Ct. 397 (1936). *See also Pacific Gas & Elec. Co. v. United States,* 664 F.2d 1133, 1136 (9th Cir. 1981); *Government of Guam v. Koster,* 362 F.2d 248, 252 (9th Cir. 1966) (regulation which purports to change unambiguous

statutory definition is void because it conflicts with statute).[5]

The meaning of "tipped employee" is clear and unambiguous in § 203(t). The effect of the amendments to § 203(m), as they relate to "tipped employees" is also unambiguous. Therefore, interpretive regulations purporting to recast the definition of "tipped employees"—which are ignorant of the subsequent changes in the statute—can have no effect if they reach a conclusion opposite to what the statute directs.

In addition to their operative conflict with the statute, there are a number of places where the regulations are plainly out of date, the most noticeable being the quotation of the pre–1974 version of § 203(m) in 29 C.F.R. § 531.50. Thus, on their face, the regulations interpret a statute that is no longer in effect. The language of the statute changed considerably after the 1974 amendments. Because the regulations are inconsistent with the present version of the statute, they are invalid.

Petitioners cite two cases which they claim "implicitly recognize" the legality of the "hourly wage method." The first, *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464 (5th Cir. 1979), is quoted for the following language: "If there was no agreement as to ownership, then the tips were the property of the recipient." 597 F.2d at 467. The authority cited by the court for this statement, however, is *Williams v. Jacksonville Terminal Co.*, 315 U.S. 386, 86 L. Ed. 914, 62 S. Ct. 659 (1942), a case decided over 30 years before the 1974 amendments. Further, petitioners fail to cite footnote 2 on the same page: "Since we affirm the district court's finding that no agreement existed regarding ownership of tips, we do not reach the question of the

---

[5]Petitioners cite two cases which they claim recognize the continuing validity of 29 C.F.R. § 531.50 *et seq.*: *Mechmet v. Four Seasons Hotels, Ltd.*, 639 F. Supp. 330 (N.D. Ill. 1986); *Lakeview Inn & Country Club, Inc. v. Rose*, 338 S.E.2d 166 (W. Va. 1985). Neither of these cases actually dealt with the "hourly wage method." The courts merely quoted the regulations to determine whether a compulsory service charge was a "tip." Because they quoted the relevant regulation in full, the courts' quotations gratuitously contain the language at issue here.

validity of such agreements in face of the 1966 amendments to § 3(m) [29 U.S.C. § 203(m)] of the Act." 597 F.2d at 467 n.2.[6]

The other case petitioners cite, Wright v. U–Let–Us Skycap Services., Inc., No. 83–K–1374 (D. Colo. July 24, 1985), actually does damage to their position. The court states flatly that an employment agreement between employer and employee which made all tips the property of the employer and which would be used toward minimum wage "directly conflicts with section 203(m) of the Fair Labor Standards Act . . ." Wright, at 3. The implication petitioners point to concerns the court's reasoning that the employees were "tipped" under the statute. The court found the employees were "tipped" because "[t]hey did not, in actuality, turn over all monies to U–Let–Us as untipped employees would do." Wright, at 4. Henry's valets, as we have noted, do turn in all their tips, as required by their own employment agreement.

While this statement could be construed as a backhanded recognition of the "hourly wage method," it is internally inconsistent with the rest of the opinion and unpersuasive. To the court, the skycaps' status as "tipped employees" triggered the protection of the act. Yet, the court found "tipped" status apparently because the skycaps didn't turn over all their tips—in clear violation of their employment agreement. In other words, because the employees violated the conditions of employment, they were protected by the act. This reasoning is flawed.

---

[6]Indeed, the court's footnote raises doubt about the "hourly wage" method's validity even before the 1974 amendments. It is arguable that the straightforward § 203(t) definition of "tipped employee" in conjunction with the original "tip credit" provision in § 203(m)—both introduced in 1966—outlawed the "hourly wage method" even before the 1974 amendments' directive that "all tips received . . . have been retained by the employee". 29 U.S.C. § 203(m). The reference in the 1974 Senate Report to the "original Congressional intent" reinforces this view. S. Report, at 43. Thus, the interpretive regulations, promulgated in 1967, may have been incorrect at their inception, purporting as they do to create a notable exception not mentioned in the statute.

More essentially, the Wright court did not consider the validity of the regulations, nor does it appear that the parties argued their validity or invalidity. On this basis alone, the case is not applicable to the one presented.

Respondents, on the other hand, cite a number of cases which lend support to their position. *See Richard v. Marriott Corp.*, 549 F.2d 303 (4th Cir.), *cert. denied*, 433 U.S. 915, 53 L. Ed. 2d 1100, 97 S. Ct. 2988 (1977) (tipped employees did not get partial minimum wage payment, in violation of § 203(m)); *Usery v. Emersons Ltd.*, 22 Wage & Hour Cas. (BNA) 1437, 80 Lab. Cas. (CCH) ¶ 33,478 (E.D. Va. 1976) (arrangement much like the one at issue outlawed by 1974 amendments; regulations to the contrary are invalid). Other cases not cited by respondents are in accord. *See Doty v. Elias*, 733 F.2d 720 (10th Cir. 1984); *Marshall v. Krystal Co.*, 467 F. Supp. 9 (E.D. Tenn. 1978). The above cases present a variety of schemes in violation of § 203(m). Some schemes allowed the employees to keep their tips but not receive the portion of the minimum wage owed to them, others had the employees turn over their tips directly to the employer, who then paid them the minimum wage. The effects of the arrangements were the same: they allowed the employer to avoid paying out the full percentage of the minimum wage as directed by § 203(m). Taken in this context, the "hourly wage method" is merely one more way to circumvent § 203(m).

Because the regulations relied on by the petitioners are in conflict with the present version of the statute and are invalid, the valets were "tipped employees" under the definition of § 203(t). Section 203(m) mandates that "tipped employees" are to keep all of their tips before an employer can deduct even 40 percent of their minimum wage obligations. Therefore, an arrangement where the employer takes all of an employee's tips and uses this money to fulfill apparently all of his minimum wage obligation—and help to pay other expenses as well—cannot be legal under the present law, outmoded interpretive regulations notwithstanding. We affirm the Court of Appeals.

## II

The valets argue on cross appeal that the trial court wrongly denied them their request for liquidated damages. The FLSA provides that in actions to recover unpaid minimum wages, the plaintiff may seek liquidated damages equal to the amount of the unpaid wages, in effect doubling the damages. 29 U.S.C. § 216(b). The Portal–to–Portal Act of 1947, however, allows an employer to prove that his actions were undertaken in good faith. If such good faith is proved, a trial court, within its discretion, may deny liquidated damages. 29 U.S.C. § 260.

Henry's argues that it undertook the payment agreement with the valets in good faith. Henry's had sought the advice of attorneys in the labor field concerning the continued validity of the "hourly wage method" and was told that the regulations were still effective.

Respondents contend that the allegation of good faith is an affirmative defense. Because Henry's did not specifically plead this affirmative defense in its answer, the valets argue that the restaurant is barred from raising it later unless the pleadings are amended. CR 8(c). Because the substantive portion of petitioners' good faith argument appears to have merit, the determination of this issue turns on procedure.

Henry's argues that the allegation of good faith was implicit in its general denial to the valets' complaint, which included an assertion for liquidated damages. Thus, it contends that good faith is not an affirmative defense. However, Henry's moved to amend its pleadings 5 weeks prior to trial to include the affirmative defense of good faith. See Supplemental Clerk's Papers at 2–7. Although the order concerning the motion is not in the record, during the proceedings the trial judge acknowledged that the motion was denied. Report of Proceedings (Dec. 12, 1986), at 8. As the proceedings continued, counsel for plaintiffs admitted that the order had not yet been entered, saying, "It's ready to be presented, it's just I never did the clerical end of it, actually getting it signed." Report of Proceedings, at 9.

The judge stated that he could not assume the contents of an order which was not signed nor presented to him.

Therefore, he ruled that the defendants' denial to the plaintiffs' claim for liquidated damages was sufficient to raise the issue of good faith at trial because "the only basis for liquidated damages would be a lack of good faith . . ." Therefore, an affirmative defense was not required. Report of Proceedings, at 10.

■ We defer to the trial judge's discretion. Under the civil rules in Washington, good faith is not an affirmative defense. Other jurisdictions, however, have held that raising the good faith defense must be affirmatively pleaded and proved in FLSA claims. *See Olson v. Superior Pontiac–GMC, Inc.,* 765 F.2d 1570, 1579, *modified on other grounds,* 776 F.2d 265 (11th Cir. 1985); *Pierce v. Concrete Prods. & Supply Co.,* 186 So. 2d 751, 755 (Miss. 1966). Nonetheless, as the trial court noted, good faith is the only defense that can be made to a claim for liquidated damages, thus a denial is sufficient to raise it.

■ More importantly, if the plaintiffs had felt prejudiced by the presentation of the good faith argument, they could have asked for a continuance. This motion would have allowed them to prepare fully for the argument if they had not anticipated this defense. Failure to move for a continuance waives the valets' right to challenge on appeal the judge's acceptance of the good faith argument at trial. *Cf. Daves v. Nastos,* 105 Wn.2d 24, 27, 711 P.2d 314 (1985).

The valets did not seek a continuance nor did they present a formal, signed order denying the defendants the right to argue the good faith defense. See Minute Entry of Trial Court, Clerk's Papers, at 66–67. In the absence of these two actions by the plaintiffs, we find no abuse of discretion. We therefore affirm the Court of Appeals on this issue.

III

■ Petitioners also contend that the attorney fees and costs awarded to the valets were excessive. The award of attorney fees is within the discretion of the trial court. *Clark v. Clark,* 72 Wn.2d 487, 491, 433 P.2d 687 (1967); *Valley v. Selfridge,* 30 Wn. App. 908, 918, 639 P.2d 225 (1982); *see also* 29 U.S.C. § 216(b). There is no indication

that the trial court's award was "untenable or manifestly unreasonable." *Clark,* 72 Wn.2d at 491. The Court of Appeals affirmed the trial court's award and awarded further fees and costs to the plaintiffs for the expenses of appeal, although it did reduce the amount requested for appellate fees. Deferring to the discretion of the trial court and the Court of Appeals, we affirm all awards of fees and costs below.

Respondents now move for additional fees and costs to cover their legal expenses from this present appeal. We allow these reasonable fees ($6,574.37) and costs ($551.93), totaling $7,126.30. We note that the plaintiffs have prevailed at every level of this litigation: at arbitration, at the trial court, at the Court of Appeals, and now here. That the amount of costs and fees has climbed to the level that it has—now totaling $63,853.33 for all levels—is therefore unavoidable.

CALLOW, C.J., and BRACHTENBACH, DOLLIVER, DORE, PEARSON, ANDERSEN, DURHAM, and SMITH, JJ., concur.