[No. 59181-4.    En Banc.    March 3, 1994.]

CARITAS SERVICES, INC., *Respondent,* v. THE
DEPARTMENT OF SOCIAL AND HEALTH SERVICES,
*Appellant.*

PACIFIC CARE CENTERS-WASHINGTON, INC., ET AL,
*Respondents,* v. THE DEPARTMENT OF SOCIAL AND
HEALTH SERVICES, *Appellant.*

393

394

*Christine O. Gregoire, Attorney General*, and *Gretchen Leanderson* and *Robert L. Schroeter, Assistants*, for appellant.

*Bennett & Bigelow, David B. Robbins*, and *Sanford E. Pitler*, for respondent Caritas Services.

*Inslee, Best, Doezie & Ryder, P.S.*, by *Thomas H. Grimm*, for respondents Pacific Care Centers-Washington, Inc., et al.

DURHAM, J. — The Department of Social and Health Services (DSHS) directly appeals the trial court's decision on summary judgment that amendments to RCW 74.46 (the Nursing Homes Auditing and Cost Reimbursement Act of 1980) and related regulations violate the impairment of contracts and due process clauses of the state and federal constitutions by retroactively reducing nursing home reimbursement rates under the Medicaid program. The provisions at issue concern the valuation of land for purposes of calculating a nursing home's return on investment allowance. We affirm.

This case revisits the "tangled skein" of state and federal statutes and regulations that is the Medicaid reimbursement scheme as it applies to nursing homes. *St. Francis Extended Health Care v. Department of Social & Health Servs.*, 115 Wn.2d 690, 706, 801 P.2d 212 (1990). As in *St. Francis*, the dispute pivots on the proper methodology for determining the return on investment component of the system for reimbursing nursing home operators. We must decide: (1) whether retroactive changes to the reimbursement methodology unconstitutionally impair the contract between DSHS and respondents or instead merely "clarify" the reimbursement scheme; (2) whether the retroactive changes deprive respondents of vested rights; (3) whether agencies may promulgate rules to apply retroactively without express statutory authorization; and (4) whether the retroactive portions of the statutes and regulations are severable.

We hold that the retroactive changes unconstitutionally impair the contracts between DSHS and respondents, that the changes deprive respondents of vested rights, and that the retroactive portions are severable. We decline to adopt at this time a per se rule requiring express authorization in an agency's enabling statute as a prerequisite to all forms of retroactive rulemaking.

### FACTS

In or about 1987, Caritas[1] discovered that DSHS had been calculating the return on investment allowance by valuing the land at the seller's original acquisition cost, instead of using the purchase price paid by Caritas. Caritas initiated an administrative appeal, contending that DSHS's own statutes and regulations required a different method of valuing the land. The administrative law judge (ALJ), and later DSHS's own review judge, agreed with Caritas. The essential dispute centers on how land as a nondepreciable asset should have been valued under the statutes and regulations then in place. The proper interpretation of the relevant statutes and regulations is key, since they are incorporated by reference into contracts between DSHS and nursing home operators providing care under Medicaid.

The Medicaid program was established pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons". *Harris v. McRae*, 448 U.S. 297, 301, 65 L. Ed. 2d 784, 100 S. Ct. 2701 (1980). States design and administer their Medicaid programs within broad federal guidelines. A description of the state's implementation of federal guidelines must be submitted in a "State Medicaid Plan" to the Health Care Financing Administration (HCFA) for approval. 42 U.S.C. § 1396a(a);

---

[1]For convenience, respondents will be referred to collectively as "Caritas". Where a plural reference is called for, "respondents" will be used. Respondents Caritas and Pacific Care each operate a nursing home, and respondent Soundcare operates four. Each of the nursing homes has contracted with DSHS to provide care to Medicaid recipients.

42 C.F.R. § 403.304(b)(1). HCFA is the agency within the Department of Health and Human Services responsible for reviewing and approving state Medicaid plans. DSHS administers the Medicaid program in this state pursuant to RCW 74.09.

Each state's plan establishes, among other things, a method for reimbursing health care providers. 42 U.S.C. § 1396a(a)(13). Among the services that a state must provide under its Medicaid programs are nursing facility services. 42 U.S.C. §§ 1396(a)(10)(A), 1396d(a)(4)(A).

Caritas contracted with DSHS to provide nursing home care to Medicaid recipients. Pursuant to such contracts, nursing homes are reimbursed in accordance with what DSHS calls the prospective cost-related reimbursement system. RCW 74.46.420. *See also* RCW 74.46.770(1). The system is set forth by statute and supporting regulations found in RCW 74.46 and WAC 388-96. The actual terms of the contract are detailed in provider agreements which in turn incorporate relevant statutes, regulations, and manuals. *See, e.g.*, Clerk's Papers (CP), at 445, 470, 473.

Under the reimbursement system, effective on July 1 of every year, DSHS sets a prospective reimbursement rate for each nursing home. That rate applies for the ensuing 12-month period. *See* former RCW 74.46.420(1); RCW 74.46-.460(1). The rate is composed of five "cost centers": property, food, nursing services, administration and operations, and return on investment. Former RCW 74.46.470(1); RCW 74.46.530(1); *see also Diversified Inv. Partnership v. Department of Social & Health Servs.*, 113 Wn.2d 19, 21, 775 P.2d. 947 (1989).

The issues in this case center on the "return on investment" component for the years July 1, 1989, through June 30, 1991. That component is based on a percentage of net invested funds. Net invested funds represent the net book value of tangible fixed assets used by the nursing home in providing Medicaid services, including the land upon which the facility is located. RCW 74.46.020(29); RCW 74.46-.530(1)(b).

The federal Deficit Reduction Act of 1984 (DEFRA) amended the Medicaid program to require assurances from states that the methodology used to calculate reimbursement payments for nursing homes could "reasonably be expected" not to increase reimbursement rates "solely as a result of a change of ownership" in excess of the increase allowable under the Medicare program. Pub. L. No. 98-369, § 2314, 98 Stat. 1079 (1984) (codified at 42 U.S.C. § 1396a(a)(13)(B)). DEFRA amended the Medicare program to restrict the valuation of "assets" after a change in ownership to the lesser of (1) the acquisition cost of the owner of record as of July 18, 1984, or (2) the acquisition cost of the new owner. 42 U.S.C. § 1395x(v)(1)(O)(i). The purpose of this payment ceiling was to assure that the Medicaid program paid for an asset only once. *See, e.g.*, Revaluation of Assets, 52 Fed. Reg. 39,928 at 39,932 (1987) (explanation of proposed changes to 42 C.F.R. § 413.134).

The Washington Legislature implemented DEFRA in 1986 by amending RCW 74.46.360, which governs calculation of an asset's depreciation basis. Laws of 1986, ch. 175. DSHS also made an analogous amendment to its regulatory counterpart, WAC 388-96-559(7). Significantly, however, no relevant amendments were made at the time to RCW 74.46.530 or WAC 388-96-754, which contain the methodology for calculating the return on investment allowance.

Congress subsequently enacted the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA). Pub. L. No. 99-272, § 9509, 100 Stat. 211 (1986). COBRA amended the Medicaid program to exclude nursing homes and other long-term care facilities from the application of DEFRA. New language was added to allow such facilities a limited step-up basis for sales of capital assets occurring after October 1, 1985. 42 U.S.C. § 1396a(a)(13)(B), (C);[2] Pub. L. No.

---

[2] Specifically, COBRA required assurances from state Medicaid programs that the state methodology for reimbursing nursing homes and other intermediate care facilities would not increase reimbursement rates "solely as a result of a change of ownership" by more than the lesser of changes in two measures of inflation. 42 U.S.C. § 1396a(a)(13)(C). Few states changed their reimbursement schemes in response to the COBRA provision allowing revaluation of assets after sale of nursing

99-272, § 9509(b); 100 Stat. 211. Respondents all purchased their facilities sometime after October 1, 1985.

Federal regulations permit state Medicaid programs to continue reimbursing nursing homes according to payment rates and standards consistent with the more stringent ceiling imposed by DEFRA if they wish to do so. *See* 52 Fed. Reg. 39,928 (1987). *See also* Government Accounting Office Report No. HRD-88-65 (Apr. 8, 1988). The Washington State Legislature has not explicitly adopted the limited asset valuation increase allowed under COBRA in its state plan.

In calculating Caritas's reimbursement rate, DSHS applied the federal DEFRA limitation to the return on investment allowance by valuing the land and buildings at the seller's acquisition cost, instead of using the purchase price paid by Caritas.

Respondent Caritas and the other nursing home operators filed separate administrative appeals in 1989, arguing (1) that COBRA superseded DEFRA as it related to nursing home Medicaid reimbursement, and (2) that Washington's implementing statutes and regulations do not apply to transfers of land as nondepreciable assets.

The appeal was heard by an ALJ, who found that the state statutes and regulations by their terms applied the DEFRA restrictions to depreciable assets only.[3] DSHS appealed the ALJ's decision to DSHS's review judge. The review judge, while limiting her ruling solely to DSHS's own regulations, held that those regulations unambiguously apply DEFRA only to depreciable assets.

Respondents next filed separate petitions in Thurston County Superior Court seeking writs of mandamus to compel DSHS to increase their reimbursement rates in accordance with the administrative decision.

---

homes, since such changes would potentially increase state costs in an era of limited state budgets. *See* Government Accounting Office Report No. HRD-88-65 (1988).

[3]Through inadvertence, the record includes only the odd-numbered pages of the ALJ's decision. We have considered the full copy included as "Appendix A" to the Brief of Respondent Caritas Services, Inc.

On January 25, 1990, while these petitions were still pending, DSHS wrote to the federal Health Care Financing Administration (HCFA) asking for an opinion on whether federal DEFRA limitations applied to transfers of land. HCFA responded to DSHS's letter on March 12, 1990. The federal agency informed DSHS that, in its opinion, DEFRA's restrictions on revaluation of assets due to a change in ownership "clear[ly] . . . [do] not exclude land". CP, at 831.

On February 12, 1990, DSHS promulgated emergency regulations retroactively amending WAC 388-96-559 and -754 to specifically apply the DEFRA limitations to transfers of land. State Register 90-05-013 (1990). Respondents subsequently filed complaints seeking declaratory judgment that the emergency regulations were unconstitutional and ultra vires.

On April 17, 1990, DSHS issued permanent regulations retroactively extending the DEFRA limitation to transfers of land occurring after July 18, 1984. State Register 90-09-061 (1990), codified at WAC 388-96-559, -561, -585, and -754.

The Superior Court issued writs of mandamus in May 1990, ordering DSHS to set respondents' return on investment rates for land in accordance with the decision of the review judge. DSHS filed an appeal from the writs. Respondents then petitioned the Superior Court for orders of contempt.

The parties subsequently entered into a combined "Settlement and General Release Agreement". Under the terms of that agreement, DSHS terminated its appeal from the writs of mandamus and agreed to pay respondents for their post-DEFRA land costs for all periods except the fiscal year July 1, 1989, through June 30, 1990.[4] DSHS also agreed to let respondents amend their complaint to include a challenge to the permanent amendments. Respondents, for their part, agreed to withdraw their requests for contempt orders and consolidate their lawsuits under one cause number.

---

[4]DSHS actually paid the increased reimbursements for all of the periods, but inserted a term in the settlement agreement requiring respondents to repay the increases for the period July 1, 1989, through June 30, 1990, in the event their challenge to the validity of the permanent regulations proved unsuccessful.

On July 1, 1991, the Legislature adopted Engrossed House Bill (EHB) 1890, 52nd Legislature (1991), which amended RCW 74.46.360, .410(2), and .530(1)(b) to expressly apply the DEFRA limitation to transfers of land occurring after July 17, 1984. Laws of 1991, 1st Sp. Sess., ch. 8, §§ 15, 17-18. The language in EHB 1890 is essentially identical to the language contained in DSHS's 1990 regulatory amendments.

Respondents subsequently amended their complaint to add EHB 1890 as an additional subject of their claim. Both parties moved for summary judgment.

On October 25, 1991, HCFA informed DSHS that it was disallowing $296,464 in federal matching funds. That figure represents the increased reimbursement for post-DEFRA land costs paid to respondents pursuant to two writs of mandamus and the combined "Settlement and General Release Agreement". HCFA explained that the payments violated the federal DEFRA ceiling contained in the state plan, because federal DEFRA restrictions do not explicitly exclude transfers of land.

The Thurston County Superior Court issued an opinion on December 16, 1991, holding that retroactive application of EHB 1890 and the regulatory amendments violates the contract and due process clauses of the state and federal constitutions. On March 26, 1992, the court issued an order denying DSHS's motion for summary judgment, granting Caritas's motion for summary judgment, and declaring the retroactive portions of EHB 1890 and the regulatory amendments invalid. The court did not construe the prior version of the statutes except to say that the provider agreements required reimbursement according to a formula that was "clearly discernible" in the agreements and in the law that existed at the time the agreements were signed and the services performed. The court believed the 1991 amendments were an attempt to retroactively change that formula. It ordered DSHS to revise respondents' return of investment rate based on their historical cost of the land and to reimburse respon-

dents for the time period July 1, 1989, through June 30, 1991.[5] This court accepted direct review.

■■ When reviewing an order granting summary judgment, the appellate court engages in the same inquiry as the trial court. *Syrovy v. Alpine Resources, Inc.*, 122 Wn.2d 544, 548 n.3, 859 P.2d 51 (1993). An appellate court will affirm summary judgment if "there is no genuine issue as to any material fact", and "the moving party is entitled to a judgment as a matter of law". CR 56(c). In summary judgment, all facts and reasonable inferences are to be considered in the light most favorable to the non-moving party, *Central Wash. Bank v. Mendelson-Zeller, Inc.*, 113 Wn.2d 346, 351, 779 P.2d 697 (1989), and all questions of law are reviewed de novo. *Syrovy*, 122 Wn.2d at 548 n.3. A statute is presumed constitutional and the party challenging it has the burden to prove it is unconstitutional beyond a reasonable doubt. *Diversified Inv. Partnership v. Department of Social & Health Servs.*, 113 Wn.2d 19, 23, 775 P.2d 947 (1989).

## CONTRACTS CLAUSE ANALYSIS

■ Caritas contends, and the trial court agreed, that retroactive application of EHB 1890 and the 1990 permanent regulations violates the contract clauses of the state and federal constitutions. *See* Const. art. 1, § 23 ("No . . . law impairing the obligations of contracts shall ever be passed"); U.S. Const. art. 1, § 10 ("No state shall . . . pass any . . . law impairing the obligation of contracts"). We give the state and federal contract clauses the same effect. *Margola Assocs. v. Seattle*, 121 Wn.2d 625, 653, 854 P.2d 23 (1993); *Washington Fed'n of State Employees v. State*, 101 Wn.2d 536, 539, 682 P.2d 869 (1984).

■ The test for legislative impairment of public contracts is more exacting than the test for legislative impairment of

---

[5]Thus, the reimbursement methodology issues have been heard consecutively by an ALJ, DSHS's own review judge, and the Superior Court. All three unanimously agree that the statutes and regulations by their terms apply the DEFRA restrictions to depreciable assets only.

private contracts.[6] The test for analyzing impairment of public contracts has three parts. First, the court must determine whether a contractual relationship exists; second, the court must determine whether the legislation substantially impairs the contractual relationship; third, when a state impairs its own contracts, the court must determine if the impairment was reasonable and necessary to serve a legitimate public purpose. *Carlstrom v. State*, 103 Wn.2d 391, 694 P.2d 1 (1985); *United States Trust Co. v. New Jersey*, 431 U.S. 1, 52 L. Ed. 2d 92, 97 S. Ct. 1505 (1977).

▇ We begin our analysis by examining the nature of the contractual relationship. To meet the first prong, the provider agreements between respondents and DSHS "must be a 'contract' in the usual sense of [that] word", that is, "an agreement of two or more minds, upon sufficient consideration, to do or not to do certain acts." *Haberman v. WPPSS*, 109 Wn.2d 107, 145, 744 P.2d 1032, 750 P.2d 254 (1987) (quoting *Crane v. Hahlo*, 258 U.S. 142, 146, 66 L. Ed. 514, 42 S. Ct. 214 (1922)), *appeal dismissed*, 488 U.S. 805 (1988).

▇ DSHS contends the provider agreements are not true contracts. We have previously held that the term "contract" as used in RCW 74.09.120 should be given its common law meaning. *Multicare Med. Ctr. v. Department of Social & Health Servs.*, 114 Wn.2d 572, 583, 790 P.2d 124 (1990). Moreover, the enabling statute requires DSHS to "purchase nursing home care by contract". RCW 74.09.120. Indeed, the record is replete with references to the "contract" between DSHS and health care providers. The provider agreements are entitled "contracts"; providers are addressed as "Dear Contractors"; "contract numbers" accompany all correspondence; "contracting officers" sign for the State; and the agreements contain a standard merger clause. It is abun-

---

[6]The United States Supreme Court has consistently affirmed "a dual standard of review" for impairment of contract cases. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 26 n.25, 52 L. Ed. 2d 92, 97 S. Ct. 1505 (1977). Impairments of a state's own contracts "face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties". *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 n.15, 57 L. Ed. 2d 727, 98 S. Ct. 2716 (1978) (citing *United States Trust Co.*, 431 U.S. at 22-23).

dantly clear from the record that the relationship between DSHS and providers is a contractual one.

DSHS argues, apparently in the alternative, that even if the agreements are "contracts", they do not create a "contractual right" to a particular rate of reimbursement. The only provision in the provider agreements relevant to this assertion is section 1, which states generally:

> All rights and obligations of the parties to this agreement shall be . . . governed by the terms of this agreement or as set forth in the laws and regulations of the State of Washington and the United States, *as now existing or hereafter adopted or amended,* relating to administration of the Title XIX Medicaid program, payment for services under such program and operation of nursing homes generally . . ..

(Italics ours.) CP, at 474.[7] DSHS argues that Caritas's only "rights" to reimbursement are statutory, and that the statutes never excluded land from the operation of the DEFRA restrictions.

This is a distinction without a difference. A contractual right to specific reimbursement is not different from a statutory right to specific reimbursement if the statute is incorporated by reference into the contract. The express incorporation of the statutes into the contract makes the statutory provisions relating to reimbursement a part of the obligation assumed by DSHS, just as if the statutory provisions had been spelled out in the contract. There is therefore no difference between mere "statutory rights" to reimbursement and contract rights to reimbursement. We hold that the provider agreements constitute a contract between DSHS and respondents.

■ Having found that a contract did exist, we must next decide whether it was substantially impaired. A contract is impaired by a statute which alters its terms, imposes new conditions or lessens its value. *Federated Am. Ins. Co. v. Marquardt,* 108 Wn.2d 651, 660, 741 P.2d 18 (1987). The retroactive application of EHB 1890 to Caritas Services, Inc. alone represents a diminution in reimbursement (without

---

[7]This is the language that has appeared in the agreements since at least September 1, 1987.

the partial settlement) of approximately $175,000, without interest. Impairment may be substantial if the complaining party relied on the supplanted portions of the contract. *See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 246, 57 L. Ed. 2d 727, 98 S. Ct. 2716 (1978). Parties are generally deemed to contract in reliance on existing law. *Margola Assocs. v. Seattle*, 121 Wn.2d at 653. Given these facts, Caritas appears to have a prima facie claim of substantial impairment.

■ DSHS argues that no diminishment of contractual expectation occurred. In *Margola*, this court noted that "a party who enters into a contract regarding an activity 'already regulated in the particular to which he now objects' is deemed to have contracted 'subject to further legislation upon the same topic.' " 121 Wn.2d at 653 (quoting *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38, 84 L. Ed. 1061, 60 S. Ct. 792 (1940)). First, it is true that Medicaid and Medicare cast a wide and heavy net of regulation. However, the seminal case on this aspect of contract clause doctrine limited itself to state impairment of private contracts, not public contracts. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 n.14, 74 L. Ed. 2d 569, 103 S. Ct. 697 (1983) (noting the stricter standard of impairment of public contracts was inapplicable since Kansas had not altered its own contractual obligations). The Court explicitly stated that, "[w]hen a State itself enters into a contract, it cannot simply walk away from its financial obligations. In almost every case, the Court has held a governmental unit to its contractual obligations when it enters financial or other markets." *Energy Reserves*, at 412 n.14. Second, it is one thing to say that parties contracting in a heavily regulated industry may be imputed to expect prospective regulatory changes. It is another thing to assert that heavy regulation gives a state as a contractor carte blanche to alter retroactively the legal consequences of completed performance. The set of expectations defined by heavy regulation does not and cannot include the expectation that a state will retroactively abrogate its contracts in violation of the

contract clause. Whether it enters contracts in a heavily regulated area or not, "a State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors". *United States Trust Co.*, 431 U.S. at 29.

DSHS next argues that the phrase "as now existing or hereafter adopted or amended" in section 1 of the provider agreements shows that the parties agreed that any contractual rights were subject to future alteration by the State Legislature. In addition, DSHS relies on a statutory reservation of powers clause. RCW 74.46.840.[8] Caritas contends the language of each clause incorporates prospective amendments only, and not retroactive changes.

The broad language of the contract's reservation of powers clause ("as now existing or hereafter adopted or amended") initially appears to be at least ambiguous, so as to present an issue of fact. There are, however, two reasons which compel us to resolve this as an issue of law rather than fact.

■ First, our case law requires such reservation clauses to be made *explicitly* contingent on future acts of the Legislature with retroactive effect.[9] *Carlstrom*, 103 Wn.2d at 393-

---

[8]RCW 74.46.840 provides:

"If any part of this chapter . . . is found by an agency of the federal government to be in conflict with federal requirements which are a prescribed condition to the receipts [*sic*] of federal funds to the state, the conflicting part . . . is hereby declared inoperative solely to the extent of the conflict and with respect to the agencies directly affected . . . .. In the event that any portion of this chapter . . . is found to be in conflict with federal requirements which are a prescribed condition to the receipt of federal funds, the secretary, to the extent that the secretary finds it to be consistent with the general policies and intent of chapters 18.51, 74.09, and 74.46 RCW, may adopt such rules as to resolve a specific conflict and which do meet minimum federal requirements."

[9]To forestall confusion, we note that states or agencies may put potential contractors explicitly on notice that the terms of a public contract are subject to retroactive adjustment as the whims or the budgetary necessities of the state may dictate. *See Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 666, 4 L. Ed. 629 (1819) (Story, J., concurring). *See also* Laurence H. Tribe, *American Constitutional Law* 618-19 (2d ed. 1988) (noting that the most basic purposes of the contract clause point to the simple principle that government must keep its word). Nevertheless, as the Supreme Court recently emphasized, "[r]etroactive legislation presents problems of unfairness that are more serious than those posed by prospec-

95, 398-99. *See also Continental Ill. Nat'l Bank & Trust Co. v. Washington*, 696 F.2d 692, 698-99 (9th Cir. 1983). *Carlstrom* concerned a reservation clause in a contract that made the public employment contract "subject to all present and future acts of the legislature". *Carlstrom*, at 393. This court concluded that the reservation was not specific enough to subject the contract to retroactive modification, *Carlstrom*, at 394-95, and we emphasized that "[t]he Legislature knows how to use plain English to make existing contracts subject to future modification". *Carlstrom*, at 398. The same rule was underscored in *Continental*, where the court held that the effect of a similar statutory reservation clause was "simply [ ] to render applicable to [future transactions] the requirements of state law then in existence so long as imposition of those requirements does not modify pre-existing contracts". *Continental*, 696 F.2d at 699. DSHS relies on a reservation clause in the contract ("as now existing or hereafter adopted or amended") and a reservation clause in the statute, RCW 74.46.840. Because neither the contract nor the statute explicitly mentions future retroactive modification of pre-existing or already-performed contracts, we hold they are insufficient to reserve the power to retroactively modify the contracts between DSHS and respondents.

Second, construing the clause in the manner DSHS suggests would allow DSHS unilaterally and retroactively to modify its contracts at will and without prior explicit notice. This result is antithetical to the intent of the contract clause. A promise in a contract that gives one party the power "to deny or change the effect of the promise, is an absurdity". *United States Trust Co.*, 431 U.S. at 25 n.23 (quoting *Murray v. Charleston*, 96 U.S. 432, 455, 24 L. Ed. 760 (1877)). *See also United States Trust Co.*, 431 U.S. at 26

tive legislation, because it can deprive citizens of legitimate expectations and upset settled transactions." *General Motors Corp. v. Romein*, ____ U.S. ____, 117 L. Ed. 2d 328, 340, 112 S. Ct. 1105 (1992).

("If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all.").

DSHS also argues that the language of DEFRA is broad enough to include both depreciable and nondepreciable assets. The 1986 enactment of COBRA, however, eliminated DEFRA as a federal *requirement* for nursing homes, so any restriction on revaluation must be found in the laws of this state.

As mentioned above, Washington implemented DEFRA solely by amending RCW 74.46.360. The version of the statute in effect at the time of the amendments limited its discussion to depreciable assets. Subsection (4)(a) stated:

> Where *depreciable assets* are acquired that were used in the medical care program subsequent to January 1, 1980, the depreciation base of the assets will not exceed the net book value which did exist or would have existed had the assets continued in use under the previous contract with the department . . ..

(Italics ours.) Laws of 1986, ch. 175, § 1, at 570. This language prohibited the new owner of the depreciable asset from using a stepped-up base when calculating depreciation, thereby assuring, in the same manner as DEFRA, that the Medicaid program would pay for such assets only once. Subsection (4)(b) excepted certain arms-length transactions from the operation of the restriction in subsection (4)(a).

The 1986 amendments added the following proviso to subsection (4)(b):

> This subsection is inoperative for any transfer of ownership of *any asset* occurring on or after July 18, 1984, leaving (a) of this subsection to apply alone to such transfers[.]

(Italics ours.) Laws of 1986, ch. 175, § 1, at 570. It is apparent from the reference to subsection (4)(a) that the term "any asset" refers to depreciable assets only, since those are the only assets addressed in that subsection.

The Legislature's decision not to amend RCW 74.46.530 is significant. That statute governs calculation of a Medicaid provider's return on investment allowance, and specifically applies to both depreciable and nondepreciable

assets. As mentioned earlier, the return on investment allowance is based on a percentage of net invested funds. The version of RCW 74.46.530(1)(b) in effect in 1986 provided:

> In computing the portion of net invested funds representing the net book value of tangible fixed assets, the same assets, depreciation bases, lives, and methods referred to in RCW 74.46-.330, 74.46.350, *74.46.360*, and 74.46.370, including owned and leased assets, shall be utilized, except that the capitalized cost of land upon which the facility is located and such other contiguous land which is reasonable and necessary for use in the regular course of providing patient care *shall also be included.*

(Italics ours.) This language expressly provides for inclusion of the capitalized cost of land in the value of fixed assets, despite any other valuation methods specified in the other statutes, including RCW 74.46.360. As the ALJ concluded,

> When DSHS and the legislature made changes only in the statute and WAC governing depreciable assets, RCW 74.46.360 and WAC 388-96-559(8)(a), and did not make changes in the specific language dealing with the capitalized cost of land in RCW 74.46.530(1)(b) and WAC 388-96-754(2)(b), it must be presumed that the intent of the change was to limit use of a stepped-up basis for only depreciable assets.

CP, at 412. Thus, the DEFRA limitation found in the 1986 version of RCW 74.46.360(4)(a) clearly does not apply to land. DSHS suggests that the Legislature never actually "intended" that result. However, a court cannot indulge in speculation about the Legislature's subjective intent or its group psychology. Unambiguous statutory language must be given its unambiguous meaning. *State v. Smith*, 117 Wn.2d 263, 270-71, 814 P.2d 652 (1991). A court may not add words to a statute even if it believes the Legislature intended something else but failed to express it adequately. *See Vita Food Prods., Inc. v. State*, 91 Wn.2d 132, 587 P.2d 535 (1978).

   ■   Finally, we find that the relevant statutes, incorporated by reference into the contract, clearly establish that reimbursement rates are to be set on a prospective basis:

> *The following principles are inherent* in RCW 74.46.430 through 74.46.590 [nursing home rate reimbursement sections]:
>
> (1) Reimbursement rates will be set *prospectively* . . . and
>
> (2) The rates so established will be adjusted for economic conditions and trends in accordance with appropriations made

by the legislature as consistent with federal requirements *for the period to be covered* by such rates.

(Italics ours.) Former RCW 74.46.420. The period covered is no more than 1 year. *See* former RCW 74.46.460 ("Each contractor's reimbursement rates will be determined prospectively at least once each calendar year, to be effective July 1st."). Given the repeated and unambiguous references to *prospective* ratesetting in both the statutes and the provider agreements, *retroactively* resetting the reimbursement rates impaired the contract between DSHS and the providers, and the magnitude of the impairment was substantial.

In sum, the provider agreements are contracts for purposes of the constitutional prohibition against impairment of contracts, and were substantially impaired by the retroactive amendments. DSHS had a contractual obligation to reimburse Caritas for its Medicaid services pursuant to the provisions of state and federal law. Neither state nor federal law mandated the DEFRA restrictions when the parties executed the contracts or when Caritas rendered the services under the contracts.[10] Because COBRA set mandatory limits and DEFRA's limits were only optional after enactment of COBRA, we hold that the limitations in COBRA must be read as incorporated by reference into the contracts between DSHS and respondents.[11]

---

[10]The foregoing discussion concerning Washington's statutory law applies equally to DSHS's implementing regulations. Those regulations use essentially the same language as their statutory counterparts. *Compare* WAC 388-96-559(7) *and* former WAC 388-96-754 *with* RCW 74.46.360 *and* former RCW 74.46.530.

[11]The Legislature departed from DEFRA by enacting the statutes here at issue, which the ALJ, DSHS's review judge, the Superior Court, and this court all find to be unambiguous. A state Medicaid plan must specify the methods and standards used to set payment rates. 42 C.F.R. § 447.252(b). The state plan for 1989-1990, approved by HCFA, incorporates by reference the provisions of RCW 74.46 and WAC 388-96. CP, at 997, 1047. Given the Legislature's adoption of unambiguous statutes which depart from DEFRA, Washington by default effectively adopted the COBRA limitations. Although we do not find it dispositive by itself, the state plan even gave explicit assurance to HCFA that Washington was within the ceilings set by *COBRA* rather than DEFRA, an assurance HCFA accepted. CP, at 995. One may compare that paragraph with the paragraph which occupies the same position in the state plan for 1987-1988. CP, at 969. The paragraph for 1987-1988 gives assurance that the state plan complies with *DEFRA*'s limitations. The only conclusion is that the 1989-1990 assurances regarding COBRA were deliberate. As an aside, we note with

██ Even if a substantial impairment of contract occurs, however, it may nonetheless be constitutional if it was reasonable and necessary to achieve a legitimate public purpose. *United States Trust Co.*, 431 U.S. at 25. In determining whether retroactive legislation is "necessary", courts consider whether the legislative purpose could have been achieved by alternative means which would not have impaired the contract. *Carlstrom*, 103 Wn.2d at 396.

██ Caritas correctly points out that the amendments were not necessary because there was no conflict between pre-amendment Washington law and federal Medicaid requirements. Federal law only requires assurances that reimbursements will not exceed the amounts allowable under COBRA. States may continue to impose the more stringent DEFRA limitations if they wish, but they are not required to do so. Implicit in this option is the additional alternative of maintaining DEFRA as to at least some assets.

Even if a conflict with federal law could be found, DSHS has not shown that retroactive legislation was the only reasonable alternative. DSHS implies that Washington's entire Medicaid program was in jeopardy. The federal regulation it cites for this proposition reads:

> FFP [federal financial participation, that is, contribution] is not available for a State's expenditures . . . *in excess of* the amounts allowable under this subpart.

(Italics ours.) 42 C.F.R. § 447.257.[12] This regulation states only that the federal government will not help pay for

concern the calculated effort of DSHS to lobby HCFA to deny federal matching funds in order to trigger RCW 74.46.840, and thus render the otherwise unambiguous provisions void. *See, e.g.,* CP, at 827-29, 835, 956-59, 1044-48. The pas de deux revealed by the record casts some doubt on whether HCFA ever independently evaluated the issues on the merits. DSHS's concerted campaign at best impaired, and at worst vitiated, the objectivity of HCFA's ultimate determination.

[12] DSHS also cites 42 U.S.C. 1396b, but fails to refer the court to a particular page or portion of this 32-page provision. The statute does not appear to provide any direct support for appellant's position.

costs in excess of the amounts allowable under the federal Medicaid program. The federal government will continue to pay its share of any costs that fall within the allowable range. State Medicaid programs will simply be held responsible for the full amount of any portions in excess of the federal ceiling. This is also consistent with HCFA's October 26, 1991, letter. HCFA informed DSHS it was disallowing federal contribution for the increased payments relating to the revaluation of respondents' land. Nothing in the letter indicates the agency was disallowing federal matching funds as to the remainder of the return on investment allowance, or as to any of the other cost centers, such as nursing services.

Thus, instead of passing retroactive legislation, the State could simply have made the payments in excess of DE-FRA, assuming again there really was a conflict with federal law.[13] For that matter, DSHS could have clarified the statute when its problems were first brought to the Department's attention. The fact that either option might have represented a significant financial burden does not, as a matter of law, render it an unreasonable alternative. "Financial necessity, though superficially compelling, has never been sufficient of itself to permit states to abrogate contracts." *Carlstrom*, 103 Wn.2d at 396. *See also United States Trust Co.*, 431 U.S. at 25-26.

Finally, DSHS consistently characterizes the amendments as "clarifying" the law with regard to reimbursement for land, and so considers them merely "curative". *See Overton v. Economic Assistance Auth.*, 96 Wn.2d 552, 558, 637 P.2d 652 (1981). However, while curative amendments are presumed to apply retroactively even if the statute does not so specify, they are not ipso facto presumed to pass muster under the contract clause. DSHS contends that the "curative" amendments come within the police power of the State to act

---

[13]DSHS cites RCW 74.09.500 and RCW 74.46.840 as prohibiting the Department from making Medicaid payments with state funds only. The statutes do not contain any such prohibition, however.

for the health, safety, and welfare of the public, and that the police power is one of the attributes of sovereignty that are implied in all contracts. However, purely financial obligations of a state do not automatically or necessarily come within the ambit of the reserved police powers doctrine. *United States Trust Co.*, 431 U.S. at 24-25. If they did, the contract clause would be simply gutted. *United States Trust Co.*, 431 U.S. at 26. Moreover, "clarifying" cannot extend to substantive alteration.

We conclude that (1) there was a contractual relationship between respondents and DSHS; (2) the retroactive amendments substantially impaired that contractual relationship; and (3) the impairment was not "reasonable and necessary to achieve a legitimate public purpose" as defined by relevant case law. Although there were statutory and contract reservation of powers provisions, they did not satisfy *Carlstrom's* rule requiring explicit mention of retroactive modification.

### Due Process and Vested Rights

DSHS argues that the trial court erred in ruling the 1991 legislative amendments violate Caritas's due process rights. As explained above, this legislation amended the state DEFRA restrictions to specifically include land. For instance, RCW 74.46.360(4)(a) was amended by changing "depreciable assets" to "land or depreciable assets" and "depreciation base of assets" to "cost basis or depreciation base of assets". Laws of 1991, 1st Sp. Sess., ch. 8, § 18. "Due process is violated if the retroactive application of a statute deprives an individual of a vested right." *In re Marriage of MacDonald*, 104 Wn.2d 745, 750, 709 P.2d 1196 (1985) (citing *Lynch v. United States*, 292 U.S. 571, 576-80, 78 L. Ed. 1434, 54 S. Ct. 840 (1934)). *See also* Laurence H. Tribe, *American Constitutional Law* 587 (2d ed. 1988) ("We deal here with the idea that government must respect 'vested rights' in property and contract—that certain settled expectations of a focused and crystallized sort should be secure against governmental disruption, at least without appropriate compensation.").

The only element at issue is whether Caritas had a vested right in the pre-amendment reimbursement methodology. A vested right entitled to protection under the due process clause:

> must be something more than a *mere expectation* based upon an anticipated continuance of the existing law; *it must have become a title,* legal or equitable, *to the present or future enjoyment of property, a demand, or a legal exemption from a demand by another.*

*MacDonald,* 104 Wn.2d at 750 (quoting *Godfrey v. State,* 84 Wn.2d 959, 963, 530 P.2d 630 (1975)).

■■ The Superior Court held that Caritas had a vested right to reimbursement based on the formula for calculating payment that existed at the time the services were performed. It is true that Caritas had no vested right in a specific reimbursement *beyond* the 1-year period of the renewable contracts, since the statutes provided for yearly changes in the reimbursement formula. But once Caritas performed its services pursuant to the contract, which included a specific formula for reimbursement, its right to reimbursement became something more than a mere expectation.

■■ DSHS points to yet another reservation of powers clause, one that specifically addresses the issue of vested rights.

> The legislature reserves the right to amend or repeal all or any part of this chapter [subchapter] at any time and there shall be no vested private right of any kind against such amendment or repeal.

RCW 74.09.780. Yet this provision facially applies only to prospective legislative amendments, and means only that no provider has a vested right against any prospective change in the reimbursement system. Its failure to explicitly mention retroactively effective changes is fatal under the rule announced in *Carlstrom.*

In any case, even an explicit reservation of state power against vested rights would not automatically pass muster under the due process clause.

> "Undoubtedly, whatever is reserved of state power *must be consistent with the fair intent of the constitutional limitation of*

*that power.*" Moreover, the scope of the State's reserved power depends on the nature of the contractual relationship with which the challenged law conflicts.

(Citation omitted. Italics ours.) *United States Trust Co.*, 431 U.S. at 21-22. We find that the retroactive amendments deprived Caritas of vested rights protected by the due process clause.

## ULTRA VIRES

██ The trial court concluded that DSHS had no authority to promulgate retroactive regulatory amendments. We need not reach this issue, since even if DSHS had the power to issue retroactive regulations, agencies do not have the power to amend unambiguous statutory language. *Winans v. W.A.S., Inc.*, 112 Wn.2d 529, 540-41, 772 P.2d 1001 (1989). Because the statutes in effect when the regulations were promulgated unambiguously did not apply the DEFRA limitation to land, we need not reach the question of whether every form of retroactive rulemaking must be grounded in an explicit grant in the agency's enabling statute. However, though the statutory amendments were not effective retroactively, they were effective prospectively from their date of enactment, July 1, 1991. Because the 1990 regulatory amendments meshed with, rather than conflicted with, their statutory analogues as of that date, we hold they were effective prospectively from July 1, 1991, and need not be repromulgated. We limit this holding to the highly unusual circumstances of this case.

## SEVERABILITY

Finally, respondents Pacific Care and Soundcare contend that the trial court erred in eliminating the retroactive portions of the regulatory amendments. DSHS asks this court not to review this issue because respondents did not file a notice of appeal or cross appeal as required by RAP 2.4(a). This court may grant affirmative relief, however, even when no such notice is filed "if demanded by the necessities of the case". RAP 2.4(a).

In its summary judgment order, the trial court said the retroactive portions of EHB 1890 were severable, and declared "the following bracketed portions" invalid. CP, at 1153. Unfortunately, the court then set out the affected portions of EHB 1890 in their entirety, apparently forgetting to insert the promised brackets. Thus, it is not clear which portions have been severed by the trial court.

Respondents argue that the trial court must have intended to simply strike the references to July 18, 1984. The court would then need to fill in the gap with some other date, presumably July 1, 1991, the date of the bill's enactment. Failure to do so would leave the affected portions incomprehensible and illogical. Respondents contend that courts do not have the power to add words to a statute. *See St. Francis Extended Health Care v. Department of Social & Health Servs.*, 115 Wn.2d 690, 704, 801 P.2d 212 (1990). Thus, respondents argue, EHB 1890 must be declared invalid in its entirety.

This argument is without merit. The Nursing Homes Auditing and Cost Reimbursement Act of 1980 contains a severability clause.

> If any *provision* of this act or its application to any person or circumstance *is held invalid, the remainder* of the act or the application of the provision to other persons or circumstances *is not affected.*

(Italics ours.) RCW 74.46.900. Respondents contend that EHB 1890's lack of a severability clause leaves the amendments crippled in their entirety. However, the act it amends, RCW 74.46, has a general severability clause. RCW 74.46.900.

The severability clause is sufficient authority for the court to strike out the retroactive references.

> An act of the legislature is not unconstitutional in its entirety because one or more of its provisions is unconstitutional unless the invalid provisions are unseverable and it cannot reasonably be believed that the legislature would have passed the one without the other, or unless the elimination of

the invalid part would render the remainder of the act incapable of accomplishing the legislative purposes.

(Citation omitted.) *State v. Anderson*, 81 Wn.2d 234, 236, 501 P.2d 184 (1972). Indeed, this result simply reflects sound policy. The Legislature should not be required to enact a new severability clause for every act every time it is amended. We hold that, absent a contrary legislative intent in the amendment, an amendment to an act containing a severability clause is upon enactment covered by that clause.

In conclusion, the agreements between DSHS and respondents were contractual; the contracts were substantially impaired by the retroactive amendments; and the amendments were not reasonable and necessary to achieve a legitimate public purpose. The retroactive amendments to the reimbursement scheme were therefore an unconstitutional impairment of contracts. Moreover, the retroactive amendments deprived respondents of vested rights. We hold that respondents must be reimbursed according to the unambiguous reimbursement methodology in place at the time of the performance of the contracts up to the ceiling set by COBRA. We remand for bracketing of the severable portions and a determination of levels of reimbursement consistent with this opinion.

ANDERSEN, C.J., and UTTER, BRACHTENBACH, DOLLIVER, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.