989 P.2d 1238 (1999)
98 Wash.App. 541
VINE STREET COMMERCIAL PARTNERSHIP, a Washington General Partnership; Smokey Point Properties, a Washington General Partnership consisting of Ralph Monty and Maryann Monty, husband and wife; Henry R. Stampf and Cindy Stampf, husband and wife; J. Robert Sandstrom and Karlene Sandstrom, husband and wife, and Ron Huitger, a single man, Appellants,
v.
The CITY OF MARYSVILLE, a Washington municipal corporation, Respondent.
No. 42206-5-I.
Court of Appeals of Washington, Division 1.
December 20, 1999.
Reconsideration Denied January 28, 2000.
*1239 William Boyd Foster, Hutchison, Foster & Weigelt, Lynnwood, Dennis W. Jordan, Everett, for Appellants.
Grant Kevin Weed, Keithly & Weed, Keithly, Weed & Graafstra, Snohomish, Michael Charles Walter, Keating, Bucklin & McCormack P.S., Seattle, for Respondent.
KENNEDY, C.J.
Vine Street Commercial Partnership and Smokey Point Properties (the property owners) appeal a summary judgment ruling by the Snohomish County Superior Court that dismissed their claims for damages arising from the City of Marysville's denial of water and sewer utility service to their propertieswhich are located outside the city limits but within a utility local improvement district (ULID) formed in 1973 for the purpose of constructing sewer mains. After the ULID was formed and the property owners had fully paid their respective assessments for the sewer mains, Marysville established a rural utility services area (RUSA) and enacted MARYSVILLE MUNICIPAL CODE MMC 14.32.040, which requires the owner of any property located outside the city limits to sign a petition for annexation by Marysville in order to obtain utility services. But the property owners petitioned for annexation by the City of Arlington, instead of Marysville. As a result, Marysville refused to grant their applications for utility services. In the course of settling various law suits preceding this one, the property owners ultimately obtained utility services from Marysville; in the present suit they seek damages arising from Marysville's allegedly "wrongful" delay in provided the services, claiming (among other things) that MMC 14.32.040 does not apply to them, and if it does that it violates the prohibition against impairment of contracts contained in article 1, section 23 of the Washington Constitution. We conclude that the criterion contained in MMC 14.32.040 relating to consent to annexation does apply to these property ownersbut in violation of the constitutional prohibition against impairment of contractsand we reverse *1240 and remand for a trial on damages or such other disposition as shall be consistent with this opinion.[1]

FACTS
In 1973, Marysville formed ULID No. 56 to improve real properties in parts of Snohomish County lying outside the city limits by constructing sewer mains, lift stations, and appurtenances. It is undisputed that the property owners' lands lie within the boundaries of ULID No. 56 and that they or their predecessors have paid the entire amount of their respective shares of the ULID assessments for the sewer improvements. When ULID No. 56 was formed, there was no requirement that persons outside the city limits desiring to connect to city water and sewer systems sign a statement of intention to annex.
In 1982, Marysville established a RUSA and adopted "rules, regulations and criteria for entering into contracts for utility services therein and the management and control of said services." Clerk's Papers at 911 (Ordinance No. 1242). The boundaries of the RUSA encompassed ULID No. 56. The first section of the RUSA ordinance provides:
RUSA shall not be construed as establishing the city as a "public utility" for properties located therein, nor shall it be construed as establishing express or implied rights for any property to connect to the city's utility system. All utility connections in rural areas are on the basis of special contracts with the city, and such contracts shall be granted or denied, as a governmental function of the city pursuant to provisions of this chapter.
MMC 14.32.010.
Later that same year, Marysville enacted MMC 14.32.040, providing in pertinent part:
The city is under no obligation to provide water and sewer utility services to any properties located outside of the city limits, with the exception of those already under contract with the city privately or through a utility local improvement district. However, any application for such services within the RUSA boundaries shall be reviewed and granted, or denied, in the city's discretion, pursuant to the following criteria:
(1) Priority shall be given to properties located within an established ULID and properties having some preexisting contractual relationship with the city for utilities.....
(2) A property applying for a utility connection must be suitable for ultimate annexation to the city based upon its proximity to the city[.] ... The owner of any property granted utility connections shall sign a petition to annex the property to the city....
....
(4) Properties located outside the city limits of Marysville seeking city sewer service shall also be required to connect to water service from the city. Any variation from this requirement shall be processed pursuant to Section 14.01.040.
MMC 14.32.050(3) provides: "Utility service to properties within a ULID, or to other properties with preexisting contractual commitments from the city, is contingent upon compliance with subsections (1) through (5) of Section 14.32.040 [but the remaining subsections (6) through (10) ] shall not apply to such properties."
The property owners signed petitions consenting that their properties be annexed to the City of Arlington, rather than Marysville. Arlington subsequently approved the petitions. Meanwhile, the property owners applied to Marysville for utility commitment letterswhich Snohomish County requires before it will issue a building permit. In September 1995, Marysville rejected the utility applications because the property owners had not executed "either an annexation covenant or annexation petition in favor of Marysville[.]" Clerk's Papers at 207; 234. In late 1995 and early 1996, the property owners applied to Marysville for utility variances for water and sewer connections. Marysville likewise rejected these applications, *1241 stating: "Because of the applicant's decision to sign a petition to annex to another city, the applicant is unable to execute a valid annexation covenant to Marysville as required by MMC 14.32.040(2)." Clerk's Papers at 451, 457.
Meanwhile, the property owners filed a series of lawsuits. One was dismissed because the property owners had not exhausted their administrative remedies; another was dismissed as moot after the property owners ultimately received water and sewer utility services from Marysville. In the current lawsuit, the property owners seek "damages arising as a result of [Marysville]'s wrongful denial of the utility letters requested and the wrongful denial of the variances requested." Clerk's Papers at 33. The property owners contend that the delays they experienced in obtaining utility commitment letters, leaving them unable to apply for county building permits, resulted in serious economic damages.
The property owners moved for summary judgment as to liability, arguing that they were entitled to damages under impairment of contract and various other theories. Marysville also moved for summary judgment, contending that it had the authority to condition water and sewer utility services outside its city limits on the property owners' consent to the annexation of their properties. The trial court granted Marysville's motion, dismissing the property owners' claims with prejudice. This appeal followed.

DISCUSSION
The property owners first claim that MMC 14.32.040 does not apply to them because the opening paragraph of the ordinance exempts those already under contract with Marysville for utility services, privately or through a ULID, from the criteria that followincluding the requirement that they sign a petition to annex to Marysville. We disagree. The opening paragraph recognizes the contractual obligation of Marysville to those already under contract, privately or through a ULID, but nevertheless purports to make those same properties subject to the criteria that follow. Moreover, any ambiguity in this regard is clarified by MMC 14.32.050(3), which specifies that utility services to properties within a ULID, or to other properties with preexisting contractual commitments are contingent upon compliance with the first five criteria of MMC 14.32.040including the requirement that an annexation petition or covenant be signed.
Thus, the pertinent inquiry is not whether Marysville's legislative body intended MMC 14.32.040 to apply to these property owners; clearly, that was the legislative intent. Rather, the pertinent inquiry is whether retroactive enforcement of the consent-to-annexation requirement contained in the ordinance impairs the obligation of a preexisting contract between the property owners and Marysville in violation of article 1, section 23 of the Washington Constitution.
Article 1, section 23 provides: "No... law impairing the obligations of contracts shall ever be passed." WASH. CONST. art. 1, § 23. This prohibition applies to any form of legislative action. Washington Fed'n of State Employees v. State, 127 Wash.2d 544, 560, 901 P.2d 1028 (1995). "The test for legislative impairment of public contracts is more exacting than the test for legislative impairment of private contracts." Caritas Servs., Inc. v. D.S.H.S., 123 Wash.2d 391, 402-03, 869 P.2d 28 (1994) (footnote omitted).
Analysis of impairment of public contracts Claims requires three inquiries: (1) Does a contractual relationship exist? (2) If so, does the legislation substantially impair the contractual relationship? (3) If it does and the State has impaired its own contract, was the impairment reasonable and necessary to serve a legitimate legislative purpose? Caritas, 123 Wash.2d at 403, 869 P.2d 28 (citing Carlstrom v. State, 103 Wash.2d 391, 394-97, 694 P.2d 1 (1985)).
Contractual Relationship
A city has no duty to extend utility services beyond its borders. Fire Protection Dist. No. 12 v. City of Yakima, 122 Wash.2d 371, 381, 858 P.2d 245 (1993). But a city may contract to provide such services. See RCW 35.21.210, -.67.310, -.91.020, -.92.010; see also RCW 35.43.075 (explaining that a petition for formation of LID or ULID outside of city *1242 limits may be denied by majority vote of legislative authority of city or town); People for Preservation & Dev. of Five Mile Prairie v. City of Spokane, 51 Wash.App. 816, 821, 755 P.2d 836 (1988) (providing that a city is under no obligation to furnish water or sewer services outside corporate limits; if it elects to do so, relationship is purely contractual); Brookens v. City of Yakima, 15 Wash.App. 464, 465-66, 550 P.2d 30 (1976) (explaining that power to supply water beyond corporate limits is permissive; supply is a matter of contract between municipality and property owners).
Marysville argues that a ULID is not a contract; rather it is "purely a mechanism for financing the infrastructure, and nothing more." Respondent's Br. at 26. This argument begs the question of why landowners petition for the formation of ULIDs in order to finance the infrastructurethey do so in the expectation that their properties will be specially benefited by the improvement, for which they will be assessed in direct proportion to the amount of the special benefit that each of them will enjoy. See generally RCW 35.43.120 (authorizing the initiation of any local improvement by petition of owners of property aggregating a majority of the area within the proposed district, stating that actual assessments may vary from assessment estimates so long as they do not exceed a figure equal to the increased true and fair value the improvement adds to the property); RCW 35.44.010 (requiring the cost and expense of improvement to be assessed upon all the property specially benefited by the local improvement in accordance with the special benefits conferred thereon); RCW 35.50.010 (explaining that a charge assessed upon the respective property in the assessment roll becomes a lien against the property that shall be paramount to all other liens except a lien for general taxes).[2]
It begs reason that a property owner might petition for the formation of a ULID knowing that the property will be assessed for the special benefit, and that the assessment will become a lien against the property, and then pay that assessment in full, with any other expectation than that when the utility becomes operational he or she will be able to hook up to ifthereby realizing the full value of the special benefit. It is true that a ULID is a financing mechanism; the same can be said of a home-improvement loan secured by a mortgage or deed of trust encumbering the property to be improved. In both instances, the property owner incurs a debt in the expectation that the property will be improved and thereby benefited, in exchange for the financial commitment. To label a ULID a financing mechanism does not answer the question of whether property owners whose property is assessed obtain enforceable rights to receive the special benefits for which they have paid.
Our Supreme Court has said:
"[T]he only legal basis for a special assessment against real estate is a finding that the improvement for which the assessment is levied will result in some special benefit to the property assessed, and the assessment cannot exceed in amount the special benefit to the property[.]"
Hargreaves v. Mukilteo Water Dist., 43 Wash.2d 326, 332, 261 P.2d 122 (1953) (quoting In re Sixth Ave., 155 Wash. 459, 471, 284 P. 738 (1930)). This is because "`the exaction from the owner of private property of the cost of a public improvement in substantial excess of the special benefits accruing to him is, to the extent of such excess, a taking, under the guise of taxation, of private property for public use without compensation.'" Id. (quoting Village of Norwood v. Baker, 172 U.S. 269, 279, 19 S.Ct. 187, 43 L.Ed. 443 (1898)).
We conclude that property owners who petition for the formation of a ULID, whose properties are then assessed for the special benefits thereby accruing, and who subsequently pay their assessments in full, are entitled to receive the special benefits for which they have paid.[3] In this respect, their *1243 relationship with the governing body that formed the ULID is indistinguishable from the relationship between parties who enter into individual contracts with the governing body for utility services, as was the case in Brookens, 15 Wash.App. 464, 550 P.2d 30, and in Five Mile Prairie, 51 Wash.App. 816, 755 P.2d 836. In both situations, there is a contract in the usual sense of that word, that is, "`an agreement of two or more minds, upon sufficient consideration, to do or not to do certain acts.'" Caritas, 123 Wash.2d at 403, 869 P.2d 28 (citations omitted).
Substantial Impairment
"A contract is impaired by a statute [that] alters its terms, imposes new conditions or lessens its value." Caritas, 123 Wash.2d at 404, 869 P.2d 28. "Parties are generally deemed to contract in reliance on existing law." Id. at 405, 869 P.2d 28. Here, when ULID No. 56 was formed, Marysville had no law requiring annexation covenants from the property owners whose property was assessed to pay for the construction of the sewer improvements. MMC 14.32.040 retroactively imposed the annexation covenant agreement after the property owners had performed by paying their assessments. Marysville, although having variance provisions, which could have addressed the problem, refused the property owners' variance applications and (initially) enforced the ordinance, thereby refusing the property owners their beneficial interest in the improvements for which they had paid. We conclude that the impairment was substantial.
Impairment Reasonably Necessary
Even a substantial impairment of a public contract may be constitutional if it was necessary to serve a legitimate public purpose. Caritas, 123 Wash.2d at 411, 869 P.2d 28. We have no quarrel with the proposition that Marysville's RUSA serves a legitimate public purpose. Indeed, we have no quarrel with the general proposition that a municipality may condition providing utility services to property lying outside its city limits upon the property owners signing annexation covenantsprovided that such a requirement is in place when the contract is formed. See Five Mile Prairie, 51 Wash.App. at 820, 755 P.2d 836 (concluding that property owners outside city limits made legal and binding promise to support annexation when they signed water service agreements with city); see also Fire Protection Dist., 122 Wash.2d at 384-85, 858 P.2d 245 (concluding that outside utility agreements containing requirement that extraterritorial landowner sign any annexation petition in the future was valid waiver of future rights in that state statute setting out requirements for annexation under petition method was in existence at time landowners signed the outside utility agreements).
But here, the annexation covenant requirement was not in existence when the property owners petitioned for the ULID, nor when the ULID was formed. Moreover, Marysville has since provided water and sewer service to the property owners, notwithstanding their petitions for annexation to Arlington, making it difficult for this court to conclude that retroactive enforcement of the annexation covenant requirement against these particular landowners in derogation of the beneficial interests for which they had long since paid was reasonably necessary to serve a legitimate public purpose.
*1244 Marysville contends that if a contract right was impaired, it was only a right to sewer service and not to water service, in that ULID No. 56 dealt only with sewer lines and appurtenances. But MMC 14.32.040(4) requires that, absent a variance, properties located outside the city limits seeking sewer services shall also be required to connect to water service from Marysville. Marysville's position is not persuasive. To set up a requirement for water service as a condition of sewer service and then to refuse the property owners water service or a variance from that requirement leads to the same resultimpairment of the vested rights arising from the property owners' participation in the ULID for the sewer system.
Marysville mischaracterizes the property owners' position as one that demands an "unconditional" right to sewer services as a result of the ULID, and argues that nothing in the statutes authorizing formation of LIDs and ULIDs remotely suggests that a municipality cannot impose reasonable conditions on connections to utility systems by participants in a ULID. The property owners do not contend that their right to connection is "unconditional." They admit, and we agree, that a city "`undoubtedly has the authority to require that [they] comply with reasonable regulations with respect to the use of the city sewer system, including the payment of reasonable charges for the service rendered, but the city should not be permitted to arbitrarily refuse [them] the right to the use of the system.'" Appellant's Br. at 16 (quoting City of El Cajon v. Heath, 86 Cal.App.2d 530, 196 P.2d 81, 83 (1948)). Nothing in our ruling limits a municipality's ability to impose reasonable regulations relating to cost of service or to public health and safety issues relating to the provision of utility services.
We also reject Marysville's contention that our ruling is tantamount to prohibiting any and all changes to zoning regulations that might be adopted following formation of a ULID. Moreover, Marysville is undoubtedly aware of laws protecting "grandfathered" non-conforming uses following changes in zoning regulationsnot an unfamiliar concept in zoning law, and one that is consistent with our ruling in the instant case in any event.
Finally, we reject Marysville's argument that these property owners "did it to themselves," so to speak, by petitioning for annexation to Arlington rather than to Marysville, with full knowledge of the provisions of MMC 14.32.040. Whether the property owners were aware of the ordinance is not the issue; the issue is the authority of Marysville to impose retroactive conditions unrelated to the cost of providing utility services, and unrelated to the capacity of the system to serve the ULID participants whose properties were assessed to pay for construction of the system, and who did pay for the construction of the system. We have applied constitutional impairment analysis because that is the way the parties briefed the dispositive issuebut it is likely that a takings analysis would have led to the same result. Indeed, the constitutional underpinning of our ruling is simply that "`the exaction from the owner of private property of the cost of a public improvement in substantial excess of the special benefits accruing to him is, to the extent of such excess, a taking, under the guise of taxation, of private property for public use without compensation.'" Hargreaves, 43 Wash.2d at 331-32, 261 P.2d 122 (emphasis omitted) (quoting Village of Norwood, 172 U.S. at 279, 19 S.Ct. 187). What a municipality cannot do in the formation of a ULID it also cannot do after the factit cannot, without paying compensation, retroactively impose conditions that effectively deprive property owners of the special benefits for which they have become obligated by assessments against their properties, after those assessments are paid in full.
We reverse the summary judgment that was granted to Marysville and remand for a *1245 trial on damages or such other disposition as shall be consistent with this opinion.[4]
WEBSTER, J., and ELLINGTON, J., concur.
NOTES
[1] This ruling makes it unnecessary to address the property owners' remaining claims raised in this appeal.
[2] Although various statutes relating to LIDs and ULIDs have been amended since the formation of ULID No. 56, the overall statutory scheme is unchanged and the amendments do not affect our opinion. For convenience, we cite to current statutes.
[3] Neither the parties nor the court have found Washington cases directly in point on this issue. Other jurisdictions have dealt with municipalities attempting to deny services to property owners whose properties had been assessed for utility improvements. See City of El Cajon v. Heath, 86 Cal.App.2d 530, 196 P.2d 81, 83 (1948) (holding that property owner who paid assessment for cost of system before property was annexed to city had beneficial interest in improvements that could not be taken by annexation of part of the sewer improvement district, and that city could impose reasonable regulations with respect to use of city sewer system including reasonable charges for the service rendered but could not arbitrarily deny property owner the use of the system); Catholic Foreign Mission Soc'y of Am. v. Village of Glen Ellyn, 339 Ill.App. 565, 90 N.E.2d 653, 655-57 (1950) (concluding that mandamus will lie to require municipality to connect property to sewer system where property had been assessed for the improvement and assessment had been paid, and that property could not be assessed unless benefited by present use of sewer or future use of such a nature that owner can enforce his rights and thereby secure benefits). These cases provide persuasive support for our ruling.
[4] We decline Marysville's invitation to review this case on other grounds raised by Marysville's cross-motion for summary judgment below, which was not ruled upon by the trial court and which is not adequately briefed for this appeal. We express no opinion as to the appropriate disposition of those issues.