[No. 52650-2-I. Division One. August 23, 2004.]

HOLMES HARBOR SEWER DISTRICT, *Appellant*, v. FRONTIER BANK,
ET AL., *Defendants*, HOLMES HARBOR HOME BUILDING, L.L.C.,
*Respondent*.

46

*Elaine L. Spencer* (of *Graham & Dunn, P.C.*), for appellant.

*Michael P. Ruark* and *Rosemary A. Larson* (of *Inslee, Best, Doezie & Ryder, P.S.*), for respondent.

BECKER, J. — Appellant Holmes Harbor Sewer District (District) seeks review of a superior court order declaring the District's charge on unimproved lots in a utility local improvement district to be a tax on property rather than a regulatory fee. We reverse.

The Holmes Harbor Golf and Yacht Club subdivision is located in Island County. The subdivision, platted in the 1960s, consists of approximately 500 lots located around a golf course. The lots are small, and most were sold to individuals who were unable to develop them because local soils will not support on-site septic systems. The Holmes Harbor Sewer District was formed to fill the need for a sewer system to facilitate development.

After two failed attempts to create a utility local improvement district (ULID) that would finance and create a sewer system, the District resolved in 1990 to form ULID 3, with

the plan of using treated effluent to irrigate the golf course.[1] The Board gave notice of its intention to carry out the plan unless the owners of at least 40 percent of the area within the ULID filed written protests.[2] Protests if any were insufficient to block the project, and the Board formally created ULID 3 by Resolution 208.[3] The Board amended its comprehensive plan to conform to an engineering report that comprehensively described and evaluated the proposed project, including its financing.[4] The engineering report specifically anticipated that not only the capital costs but also the yearly operation and maintenance costs would have to be generated by the District through assessment and service charges.[5] The report stated, "It will be necessary to establish a monthly charge to each property within the District to which sewer service will be available."[6]

The District obtained preliminary financing in the form of a liquidity reserve from the company that owned the golf course, an affiliate of Respondent Holmes Harbor Home Building, L.L.C. The District hired an appraiser to determine, for each parcel, the benefit it would receive from sewer service. In the summer of 1993 the final assessment roll was confirmed, and bonds were sold to finance purchase of land and construction of treatment facilities. A share of the capital costs was allocated to each lot as a special assessment. Sewer lines were constructed throughout the subdivision in the right-of-way adjacent to each lot, with a stub to each property line. Upon development of a lot, a septic tank and pump could be installed on the lot and connected to the stub.

The District's Board of Commissioners adopted regulations for governing the newly created sewer system in 1995.

---

[1] Resolution 206, at Clerk's Papers 212. *See* RCW 57.16.060.

[2] Clerk's Papers at 218. *See* RCW 57.16.060.

[3] Clerk's Papers at 221. *See* RCW 57.16.062.

[4] Resolution 213, at Clerk's Papers 116. *See* RCW 57.16.010(2).

[5] Clerk's Papers at 151.

[6] Clerk's Papers at 148.

Resolution 264 specifies the time and manner of connection to the sewer system. It regulates the ownership, nature, and location of on-site facilities which undeveloped property may use with the system.[7] It prohibits the use of private sewage systems for undeveloped property and restricts the types of effluent discharged into the system. It makes connection to the system contingent upon payment of a connection fee and provides a variance procedure.

In 1995, the Board of Commissioners also adopted Resolution 266, the first of a number of rate resolutions.[8] The resolution cited statutory authority "to set rates and charges for the furnishing of sewerage disposal service for those to whom sewerage disposal service is available" and imposed "monthly rates" on all properties.[9] In this initial resolution, the Board set a flat monthly charge of $25 for developed property and $15 for each lot not connected to the sewer system.[10] The rates have increased over the years, but the $10 differential has remained constant. By August 2002, the monthly rates were $58.33 for improved properties and $48.33 for vacant lots.

Respondent Holmes Harbor Home Building, L.L.C., is the owner of several unimproved lots subject to the charge. These lots generate no sewage and are not hooked up to the sewer. Home Building refused to pay the monthly charge on the unimproved lots. The District instituted an action to enforce a lien against properties owned by Home Building. Both parties moved for summary judgment. The trial court found that the facts were essentially undisputed, concluded that the charge was an unconstitutional tax, and granted Home Building relief by dismissing the foreclosure proceedings filed by the District.

The trial court set forth its reasoning in a memorandum opinion. The court first found that the District has express

---

[7] Clerk's Papers at 409-20.

[8] Clerk's Papers at 422-25.

[9] Clerk's Papers at 422 (citing former RCW 56.16.090 (1995)).

[10] Clerk's Papers at 423.

statutory authority to charge undeveloped properties for the availability of services, based on a statute which—similar to its predecessor statute—allows the District to set charges "for furnishing sewer and drainage service and facilities to those to whom service is available." RCW 57.08.081(1).

The trial court then applied the legal analysis that has evolved in a series of cases where courts have been asked to determine whether a charge is truly a regulatory fee rather than a tax in disguise. The court identified *Samis Land Co. v. City of Soap Lake*, 143 Wn.2d 798, 23 P.3d 477 (2001), as controlling authority. At issue in *Samis* was a flat-rate annual fee of $60 imposed by the City of Soap Lake against unimproved properties abutting a municipal water or sewer line. The City conceded the "standby charge" was enacted to raise revenue. *Samis*, 143 Wn.2d at 808. There was no utility-related regulatory activity benefiting the unimproved lots to which the charge could be allocated. And there was no direct relationship between the fee and the property because the property neither received any sewer service nor burdened the sewer system. Thus, the *Samis* court held that the standby charge was a tax and not a fee. *Samis*, 143 Wn.2d at 814.

The trial court considered itself constrained by *Samis* to rule that the District's charge against Home Building's unimproved lots was a property tax rather than a regulatory fee. The court then determined that as a property tax the charge could not be collected because it was not imposed in a uniform manner based on the value of each parcel, as is required for property taxes by the Washington Constitution.[11] The trial court's decision nevertheless left open the possibility that the District could constitutionally charge unimproved lots for availability of service if the charge was redesigned to pass muster as a property tax.

Both parties appeal. The District contends the court erred in determining that the charge was a tax rather than

---

[11] WASH. CONST. art. VII, § 1.

a fee, while Home Building contends that the District does not have statutory authority to charge an availability fee in any form.

When reviewing an order for summary judgment, we engage in the same inquiry as the trial court and will affirm summary judgment if there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 698, 952 P.2d 590 (1998); *see also* CR 56(c). Where reasonable minds could reach but one conclusion, the trial court may determine questions of fact as a matter of law. *Alexander v. County of Walla Walla*, 84 Wn. App. 687, 692, 929 P.2d 1182 (1997). Questions of law are reviewed de novo. *Rivett v. City of Tacoma*, 123 Wn.2d 573, 578, 870 P.2d 299 (1994).

## STATUTORY AUTHORITY FOR AVAILABILITY CHARGE

We will begin, as did the trial court, with the issue raised by Home Building's cross appeal: Does the District have statutory authority to charge rates to owners of vacant lots to whom service is available? We conclude, as did the trial court, that the answer is yes. The relevant statute provides:

> [T]he commissioners of any district shall provide for revenues by fixing rates and charges for furnishing sewer and drainage service and facilities *to those to whom service is available* or for providing water, such rates and charges to be fixed as deemed necessary by the commissioners, so that uniform charges will be made for the same class of customer or service and facility. Rates and charges may be combined for the furnishing of more than one type of sewer or drainage service and facilities.

RCW 57.08.081(1) (emphasis added). The statute affords considerable discretion to a district in classifying its customers by using such factors as location and different character of the service furnished, so long as the distinction is reasonable. RCW 57.08.081(2).

The statute does not limit the district commissioners to imposing rates and charges upon lots with an actual connection to sewer facilities. Rather, the statute expressly states that the commissioners may fix rates and charges for furnishing sewer service and facilities "to those to whom service is available." There is no doubt that the District makes its sewer service available to both developed and undeveloped lots.

The key case on this point is *Ronald Sewer District v. Brill*, 28 Wn. App. 176, 622 P.2d 393 (1980). In *Brill*, a municipal sewer district sought to foreclose a lien for unpaid sewer service charges against property that was not connected to the district's sewer lines running adjacent to it. The property owner had refused to pay such charges. The trial court granted summary judgment to the owner. This court reversed, based on its interpretation of RCW 56.16.090, the predecessor to RCW 57.08.081. That statute provided that the commissioners of any sewer district "shall provide for revenues by fixing rates and charges for the furnishing of sewerage disposal service *to those to whom such service is available.*" RCW 56.16.090 (1980) (emphasis added).

Until an amendment in 1959, the critical phrase had been "to those receiving such service." *Brill*, 28 Wn. App. at 178. The court cited the familiar principle that when a statute is amended and a material change is made in the wording, there is a presumption that the legislature intended to change the law. *Brill*, 28 Wn. App. at 178 (citing *Childers v. Childers*, 89 Wn.2d 592, 575 P.2d 201 (1978)). Thus, the court presumed that by changing the language of the statute, the legislature intended that *availability* of service to the property would render the property subject to service charges.

As the trial court observed, *Brill* has never been overruled and Home Building's efforts to distinguish it are unpersuasive. It remains good law and supports the straightforward construction of RCW 57.08.081(1) that the sewer district commissioners may impose rates and charges

against undeveloped lots to which service is available, even though such lots are not connected to the district's sewer facilities. We affirm the trial court on the issue raised by Home Building's cross appeal.

## TAX OR REGULATORY FEE

■ To decide whether the District is taxing Home Building's lots or merely charging a regulatory fee, we apply the three-part test articulated in *Covell v. City of Seattle*, 127 Wn.2d 874, 905 P.2d 324 (1995) and *Samis Land Co. v. City of Soap Lake*, 143 Wn.2d 798, 23 P.3d 477 (2001). The first question is whether the primary purpose of the District is "to 'regulate' the fee payers, or to collect revenue to finance broad-based public improvements that cost money." *Samis*, 143 Wn.2d at 806. Second is whether or not the money collected by the charge is segregated and allocated exclusively to regulating the entity or the activity being assessed. *Samis*, 143 Wn.2d at 806. The third factor is whether there is a direct relationship between the rate charged and either a service received by the fee payers or a burden to which they contribute. *Samis*, 143 Wn.2d at 806.

First we address whether the District's primary purpose in enacting its rate resolutions was to collect revenue in order to finance broad-based public improvements. The trial court found that it was, based in part upon the use of the term "revenues" in the authorizing statute: commissioners "shall provide for revenues by fixing rates and charges." RCW 57.08.081(1).

■■ We are not aware of authority holding that when the legislature uses the word "revenue," the means of generating it must necessarily be a tax rather than a fee. Indeed, the most pertinent dictionary definition of "revenue" is "public income of whatever kind." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1942 (1986). Thus, the statutory term "revenue" is not the significant term in the first part of the test. What is significant is that if the purpose of collecting the revenue is to finance broad-based public

improvements, the charge is more likely to be a tax; if its purpose is particularized to the payers from whom the revenue is collected, it is more likely to be a fee.

■ The existence of a comprehensive plan of regulation can be a significant consideration in construing the purpose of a disputed charge. *See Thurston County Rental Owners Ass'n v. Thurston County*, 85 Wn. App. 171, 178, 931 P.2d 208 (1997) (permit fees for construction of septic systems were regulatory because they were imposed as part of overall plan to regulate septic systems for groundwater protection). Here, the District's comprehensive plan provides for sewer service to be available to each assessed property, whether developed or not; and only to those assessed properties. Resolution 264 protects the capital investment made by owners of the assessed lots as well as their right to service, through a comprehensive set of regulations that prohibit private sewage systems on undeveloped property, regulate the content that may be discharged to the system, and specify the nature, location, and ownership of on-site facilities that may be used with the system.

Unlike the city streets of Seattle discussed in *Covell*, where the court held that a residential street utility charge was a property tax in disguise, the District sewer system is not constructed for or used by the general public. Only those properties that pay for ongoing maintenance and operations may use the system.

We conclude the "fundamental legislative impetus" of the District's sewer system resolutions, including the monthly rates, was to provide the ratepayers with ongoing sewer service. *See Samis*, 143 Wn.2d at 807. Because sewer service is a valid regulatory purpose and the rates were incidental to the purpose, the District meets the primary purpose test.

Next we address the question of whether the money collected from the fees was segregated and allocated exclusively to regulating the entity or activity being assessed. In *Samis*, the standby charges collected by Soap Lake were

allocated to maintaining and improving the city-wide utility system. The court concluded that the funds collected from undeveloped properties regulated "an entirely distinct group to which the standby charge does not apply, namely, entities connected to the city utility system." *Samis*, 143 Wn.2d at 810-11 (emphasis omitted).

Here, in contrast, the monthly rates support the maintenance and operation of a system in which each property has been invested from the start. The District, unlike Soap Lake, is a special purpose municipal corporation organized for the sole purpose of providing wastewater services.

■ As the District acknowledges, the monthly charges provide money to pay for the District's overhead expenses: employee salaries and benefits, costs related to servicing the financing, and legal fees. But the fact that the charges are devoted to "overhead" does not dispositively prove the charges are a tax. To "regulate"—i.e., to provide fee payers with a targeted service or alleviate a burden to which they contribute—necessarily requires an administrative structure with overhead expenses.

Home Building contends the fees are not exclusively allocated to regulating wastewater services but are used for unrelated expenditures. Home Building's prime example to illustrate this point is a decision the District board allegedly made to become unwisely involved in a futile and costly development project known as "Silver Sound."[12] Home Building also complains that the district commissioners, who are elected by residents, have an incentive to make decisions that benefit the owners of the occupied lots at the expense of the owners of the vacant lots.

■ Although the record supplies few particulars about the Snohomish County venture, for purposes of summary judgment we will accept as true Home Building's description of it as a "fiasco."[13] Home Building has not, however, demonstrated that the District's involvement in this project

---

[12] Clerk's Papers at 63.

[13] Clerk's Papers at 63.

means the District was acting as a general purpose government or raising money for something other than wastewater services for the benefit of the fee payers. The District's budget is part of the record. Home Building has not shown that any item identified in the budget is for some purpose other than providing and regulating a system for wastewater service in the District.

Granted, fee payers sometimes have valid reason to question whether the revenue is being spent in a fiscally responsible manner. But if the District acted wrongly in spending money on the Silver Sound project, it does not bear on the question whether the charge on unimproved lots was a tax rather than a fee. If the District is wasting money, the loss will be borne by all lots, whether developed or undeveloped. If the District is charging unreasonably high rates against the owners of vacant lots because they are nonresidents, the remedy is to declare the rates arbitrary, not to recharacterize them as taxes.

Unlike in *Samis*, here it is not appropriate to view the entities connected to the sewer line as a group entirely distinct from the entities that are not connected. All the assessed lots embarked together upon the formation of the ULID. Together, they contributed to the capital costs of getting the pipes in the ground and building the treatment plant. Each lot is specially benefited by the availability of sewer service, as demonstrated by the appraiser's report. The owners accepted the special benefit when, collectively, they assented to the formation of the ULID knowing they would be assessed for the construction of the sewer. By paying the initial assessment for the capital costs, they obtained an enforceable right to receive the special benefits for which they have paid. *See Vine St. Commercial P'ship v. City of Marysville*, 98 Wn. App. 541, 549, 989 P.2d 1238 (1999).

In *Samis*, the City of Soap Lake, as a general purpose government, presumably had other sources of funds with which to support its municipal water and sewer system. Here, Home Building has not shown that the District has

any way other than monthly charges against lot owners to support the administrative structure necessary for carrying out its obligation to protect the investment all lot owners have made in the sewer system.

The District's purpose was to make sewage disposal service available. All of its revenue is allocated to this purpose. We conclude the District meets the exclusive allocation test.

Finally, we address whether there is a direct relationship between the fee charged to Home Building and either a service they receive, or a burden to which they contribute. Home Building argues that there is no identifiable service that the District provides to the undeveloped properties, nor any burden to which the properties contribute, as they are not connected to the sewer system.

The District argues that its availability charge meets the test because each assessed property has a right to use the sewer system. According to the district, this right—enforceable by each lot owner as held in *Vine Street Commercial Partnership*—creates a corresponding obligation on the part of the District to maintain that system for all properties within the ULID, regardless of whether they are connected to the system.

We agree with the District. The burden of maintaining the system must be shared by all lot owners, even those not presently hooked up. *Covell* recognizes that utility charges are legitimate when they amount to a "special assessment." A special assessment "is a charge imposed on property owners within a limited area to help pay the cost of a local improvement which specially benefits property within that area." *Covell*, 127 Wn.2d at 889. The monthly charges imposed by the District fit this description.

The rationale for maintenance and operations assessments in special purpose districts is well explained in, *Otis Orchards Co. v. Otis Orchards Irrigation Dist. No. 1*, 124 Wash. 510, 215 P. 23 (1923).

It is generally understood that land within a district is benefited by an irrigation system to the extent that the added facilities for irrigation add to the value of the land itself, and this does not depend upon the use the owner may make of the water. The value of the right conferred or added, and not the extent to which the property owner may take advantage of the right, is the test to determine whether a benefit has been received. It is well understood that the owner of vacant and unimproved property may not object to an assessment for a sidewalk or sewer on the ground that he does not expect to improve his property and therefore will have no use for such improvement.

We do not understand that the appellant controverts this proposition, but it argues that, since it is not using the water, and since it is willing to agree not to use it for a certain season, it would be unjust to require it to pay an assessment for operation and maintenance. If one property owner may do this, others could do the same, and the result might be that the cost of maintenance and operation of the plant would have to be borne during a particular season by a small number of the property owners within the district. There is no provision in the law exempting the property owner from the payment of assessments for operation and maintenance when he does not make use of the water. *The lands within the district available for and subject to irrigation under the system constructed should be considered as a whole and the assessment spread upon all lands which are or may be supplied with water by the district by means of the system which it operates.* Any other conclusion could easily result in practically destroying the power of the district of accomplishing the purpose for which it was organized.[14]

In *Samis*, the Supreme Court distinguished *Otis Orchards* because it "involved special assessments in a 'duly organized irrigation district under the laws of this state.' " *Samis*, 143 Wn.2d at 813 n.50. In this case, *Otis Orchards* is applicable. The District is a duly organized sewer district under the laws of this state. Its monthly charges are directly related to the administrative burden the District

---

[14] *Otis Orchards Co.*, 124 Wash. at 513-14 (emphasis added).

assumed when it constructed the sewer system. We conclude the District meets the "direct relationship" test.

In short, the District's charge to unimproved lots is a valid regulatory fee. We reverse the trial court's ruling that it is a tax and remand for entry of judgment in favor of the District.

KENNEDY and APPELWICK, JJ., concur.

Review granted at 154 Wn.2d 1001 (2005).