[No. 53967-1-I.   Division One.   February 28, 2005.]

ROBERT A. FUNK ET AL., *Appellants*, v. THE CITY OF DUVALL ET AL., *Respondents*.

---

[27] *Proios*, 72 Wn. App. at 198.

*Chris L. Farias* and *James A. Oliver* (of *Short Cressman & Burgess, P.L.L.C.*), for appellants.

*John M. Stellwagen* and *Michael B. Tierney* (of *Law Office of Michael B. Tierney, P.C.*), for respondents.

¶1 BECKER, J. — Appellants Funk, Benton, and Anderson own property in the city of Duvall (City) within the boundaries of a local improvement district formed by the City in 1974 to help finance the construction of the City's first sewage treatment plant and sewer system. The appellants paid assessments but did not connect their properties to the sewer at that time. Years later, when they decided to develop their properties, they were unable to obtain a commitment for sewer service. The plant had very little capacity above what was necessary to serve current users and developers with vested rights. The City was planning to expand the treatment plant, and in the meantime had allocated the limited available capacity by a lottery.

¶2 The appellants were not satisfied by the outcome of the lottery. They sued the City, claiming that their payment of the assessments gave them a contractual right to be first in priority for the allocation of the limited capacity and that the City's allocation decisions had impaired this right. Because the appellants have not shown they were promised priority in the event of a shortage, we affirm the order of summary judgment dismissing their claim.

¶3 The City funded part of the construction of its original sewer system and waste treatment plant by means of a Utility Local Improvement District (ULID), formed in December 1974 by passage of an ordinance. At the time of formation, the ULID was coextensive with the city limits. All properties within its boundaries—including lots belonging to appellants Funk, Benton, and Anderson—were levied an assessment as being "specially benefited by such improvement."[1] Funk paid an assessment of $1,442.17, Benton paid $958.50, and Anderson paid $462.20. To hook up to the sewer system, property owners had to pay a

---

[1] Clerk's Papers at 88 (Duvall City Ordinance 200).

connection charge as well. Appellants did not pay the connection charge. Their land, like much of the property in the ULID, was undeveloped.

¶4 The plant was designed to serve up to 2,000 people. As time went on, the number of households needing service grew as the City expanded beyond the boundaries of the ULID. Property owners within the new city limits who had not paid the original ULID assessment were allowed to hook up to the sewer system. To do so they had to pay not only the connection charge but also a "sewer equalization charge" based on the square footage of the property.[2]

¶5 The treatment plant was expected to last until the end of the century.[3] As it turned out, however, the plant as designed was insufficient to serve the capacity needs of a growing city. Both the number of households and the average use per household were greater than originally anticipated. And as time went on, the City also had to begin dealing with pollution problems caused by the treatment plant's discharge of effluent into the Snoqualmie River. In the late 1980s the treatment plant began to violate the terms of its State operating permit. The State Department of Ecology required the City to impose a moratorium on sewer hookups that lasted from 1989 until 1992.

¶6 As part of the resolution to the population and pollution problems, Duvall built a new sewage treatment plant. While the new plant is located on the site of the original ULID plant and contains some of its components, the core of the plant is entirely new construction. The City did not use the ULID method to finance the new plant, instead relying on a combination of grants, loans, and rate increases.

¶7 By 1999, this second treatment plant system was approaching its capacity. The City found that "when vested projects are completely built out, the plant will likely be at

---

[2] Duvall Municipal Code 9.04.115.

[3] "The life of the foregoing system of sewerage to be acquired and constructed as part of the waterworks utility of the Town is hereby declared to be at least thirty (30) years." Clerk's Papers at 946 (Duvall City Ordinance 182).

or near capacity,"[4] and imposed a six-month moratorium on the filing of applications for development. Exempted from the moratorium were "previously submitted, fully complete applications which comply with currently adopted codes, regulations and standards. Such projects, by virtue of their vested status, can proceed to complete build-out."[5] Over the next few years, the City renewed the moratorium (and its exemption for vested projects) at regular intervals while going forward with plans to improve and expand its facilities. The City has now secured permits and funds for the construction of a new treatment plant, its third, and expects to complete this project sometime in 2005.[6]

¶8 In the meantime, after obtaining modifications to the operating permit for the existing treatment plant, the City consulted with an engineering firm and determined that a small amount of capacity was available above the requirements of current users. The available capacity was 850 Equivalent Residential Units—each unit equivalent to the use of a typical single family home. Of this amount, 710 units were necessary to serve the "committed" population[7]—the developers with vested rights who had been exempted from the moratorium. This left 140 units that could be allocated to applicants for new development who, under the moratorium, had been prohibited from filing their applications. Ordinance 952, enacted in 2002, provided that the City would allocate these 140 units through a lottery system based on applications submitted for specific parcels within the city limits.[8]

¶9 The first 12 applications chosen in the lottery depleted all of the 140 units. Some of the winners forfeited their allocations by failing to meet a deadline for submitting development applications. This made 33 units avail-

---

[4] Duvall City Ordinance 885, Clerk's Papers at 270.

[5] Duvall City Ordinance 885, Clerk's Papers at 271.

[6] Clerk's Papers at 690.

[7] Clerk's Papers at 106 engineering firm letter to City Engineer.

[8] Duvall City Ordinance 952, Clerk's Papers at 108-16.

able for a second round of allocations. Appellant Funk, being first on the waiting list, received 30 of these units—the total he had requested. Appellant Benton received an allocation of one unit in each round, but forfeited them because his lots are adjoining and it did not make economic sense to develop only one lot at a time. Appellant Anderson did not receive any allocations in either round.

¶10 The appellants sued the City alleging damages caused by the delay of their plans for development. All of their claims are dependent on a theory of impairment of contract. They claim a contractual right to priority in sewer service created by their payment of the assessments for the original ULID. They claim the City impaired this right by allowing non-ULID properties to go to the head of the line for sewer hookups. The trial court dismissed this claim on summary judgment, and the owners appeal.

¶11 Applying the usual de novo standard of review, we engage in the same inquiry as the trial court and consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Right-Price Recreation, L.L.C. v. Connells Prairie Cmty. Council*, 146 Wn.2d 370, 381, 46 P.3d 789 (2002). Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. CR 56(c).

¶12 The appellants rely on *Vine Street Commercial Partnership v. City of Marysville*, 98 Wn. App. 541, 989 P.2d 1238 (1999), *review denied*, 141 Wn.2d 1006 (2000). In *Vine Street*, owners of property located outside the city limits successfully petitioned the city of Marysville for formation of a utility local improvement district. *Vine St.*, 98 Wn. App. at 549. The owners paid their assessments in full. Some time later, Marysville enacted an ordinance requiring owners of property outside the city limits to sign a petition for annexation by Marysville as a condition for obtaining utility service. Some owners did not comply with this ordinance. Instead, they petitioned for annexation by the city of Arlington. As a result, Marysville denied their applications for utility service. The owners' claims for delay

damages were dismissed by the trial court on summary judgment. The issue on appeal was whether the Marysville ordinance violated the constitutional protection against impairment of contracts.[9] *Vine St.*, 98 Wn. App. at 543. This court held that it did.

¶13 The court in *Vine Street* set forth the three-step analysis of a claim for impairment of a public contract. First, does a contractual relationship exist? Second, does the legislation substantially impair the contractual relationship? Finally, if it does and the State has impaired its own contract, was the impairment reasonable and necessary to serve a legitimate legislative purpose? *Vine St.*, 98 Wn. App. at 547.

¶14 As to the first question, Marysville argued that the ULID was purely a financing mechanism, not a contract. We stated that this argument "begs the question" why owners would petition for a ULID and incur the resulting assessment without being able to realize the full value of the "special benefits" for which they paid. *Vine St.*, 98 Wn. App. at 548. We found that a contractual relationship existed between the owners and Marysville by virtue of the successful petition to form the ULID and the resulting payment of the special assessment:

> We conclude that property owners who petition for the formation of a ULID, whose properties are then assessed for the special benefits thereby accruing, and who subsequently pay their assessments in full, are entitled to receive the special benefits for which they have paid. In this respect, their relationship with the governing body that formed the ULID is indistinguishable from the relationship between parties who enter into individual contracts with the governing body for utility services. . . . In both situations, there is a contract in the usual sense of that word, that is, "an agreement of two or more minds, upon sufficient consideration, to do or not to do certain acts."

---

[9] "No . . . law impairing the obligations of contracts shall ever be passed." WASH. CONST. art. I, § 23.

*Vine St.*, 98 Wn. App. at 549-50 (citations and footnote omitted) (quoting *Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.*, 123 Wn.2d 391, 403, 869 P.2d 28 (1994)).

¶15 As to the second question, the later enacted ordinance impermissibly impaired this contract by imposing a new condition of annexation after the property owners had performed by paying their assessments. Marysville used the ordinance imposing the new condition as a basis for refusing to grant the owners their beneficial interest in the improvements for which they had paid. *Vine St.*, 98 Wn. App. at 550. As to the third question, the impairment was unconstitutional because Marysville had not established that such an ordinance was reasonably necessary to serve a legitimate public interest. *Vine St.*, 98 Wn. App. at 550-51.

¶16 The owners in this case argue that their situation is directly analogous. They claim their payment of assessments guaranteed them the right to a sewer hookup when they developed their properties in the future. They claim that after they performed by paying their assessments, the City impermissibly impaired this contract by allowing other owners—who had acquired their right to service later—to have priority. They recognize that the City's problems with pollution and capacity have provided legitimate reasons for imposing a moratorium on development, but they contend that once new capacity became available, they had a guaranteed priority right to it as compared to non-ULID members.

■ ¶17 Assuming that a contractual right to a sewer connection is the "special benefit" the appellants obtained when they paid their assessments for the original ULID, we find no basis for their claim that the City promised them priority in the event of a shortage.

¶18 The legislative acts which appellants contend impaired their right to sewer service are the moratorium ordinances from 1999 to the present, which effectively gave priority to developers with vested rights, and Ordinance 952, which allocated the 140 surplus units by lottery. Unlike the Marysville ordinance in *Vine Street*, which required

agreement to annexation as a new condition to sewer service, the City's ordinances did not require appellants to perform any additional act as a new condition to receiving sewer service. Unlike the residents in *Vine Street*, appellants are not being denied a right to a connection until they satisfy a new condition. Rather, they are being made to wait until capacity becomes available.

¶19 The appellants recognize that if their argument is to be successful, they must establish more than a bare right to a connection. They must establish a contractual right to priority over latecomers in the event of shortage. Appellants define the benefit conferred by their payment of the assessment as "a present right to a future connection."[10] They then say the City should have always saved enough capacity to ensure that they could exercise their right to a hookup whenever it was convenient for them:

> The City used up the capacity in the first WWTP [Waste Water Treatment Plant] by allowing latecomers who were not members of the ULID to take capacity *that otherwise should have gone to the Appellants*, instead of planning sufficiently ahead to expand the City's WWTP and sewer system to accommodate latecomers when all capacity for the first WWTP—designed to have a 30-year lifetime to serve the members of the ULID who paid to construct it—was allocated to ULID members (even if the ULID member was not yet using that capacity). Appellants had a right to a future connection, *and the City had an obligation to provide that future connection when the need arose.*[11]

¶20 The ordinance creating the original ULID did not promise to reserve capacity for the ULID properties. The ordinance did not anticipate shortages and did not provide a method for dealing with them. There is no evidence of a promise to give priority in the event of a shortage to owners within the original ULID. At most, there is evidence that every property for which an assessment was paid was guaranteed a sewer hookup after the system was con-

---

[10] Reply Br. of Appellants at 9.

[11] Reply Br. of Appellants at 10-11 (emphasis added).

structed, with no time limit on claiming the right to a hookup.[12] This is not a promise that a hookup will be provided immediately on demand. It is not a promise to deny capacity to new residents who are ready to develop in order to reserve capacity for residents who are not, and may never be, ready to develop.

¶21 The appellants rely not only on *Vine Street*, but also on two cases from other states, *Catholic Foreign Mission Society of America, Inc. v. Village of Glen Ellyn*, 339 Ill. App. 565, 90 N.E.2d 653 (1950); and *City of El Cajon v. Heath*, 86 Cal. App. 2d 530, 196 P.2d 81 (1948). Like *Vine Street*, these two cases recognize that payment of an assessment in an improvement district may create a contractual right to sewer service. In *Catholic Foreign Mission Society*, the court held that a right to sewer service for a particular property, which accrued as a result of payment of assessments, was not abrogated when the property became disconnected from the Village and was no longer in its corporate limits.

> The property of appellee, in the first instance, could only have been assessed upon the finding that it would receive a present benefit from the improvement, or that it would have an assured future enjoyment of benefit to be derived from it. The ordinance therefore created an obligation, binding upon appellant to permit the connection, and binding upon the appellee to pay the assessment made against its property.

*Catholic Foreign Mission Soc.*, 339 Ill. App. at 571, 90 N.E.2d at 656 (citations omitted). In *Heath*, owners of a property contiguous to the city's borders were held entitled to continuing use of a sewer treatment system for which they had long ago paid an assessment, notwithstanding the fact that their property was outside that portion of the improvement district the city had recently annexed.

¶22 Like *Vine Street*, these two cases speak to the enduring nature of a right to sewer service established by payment of

---

[12] Decl. of George Hieber, Clerk's Papers at 393-95.

an assessment as against a municipality's attempt to abrogate the right altogether based on the property being outside the city limits. Their fact patterns do not involve capacity shortages resulting from pollution problems and population growth. Consequently, they provide no guidance in this case, in which the municipality faced the necessity to allocate temporarily limited capacity.

¶23 In summary, appellants have not identified an issue of material fact that would bring this case within the holding of *Vine Street*. They have not demonstrated that the special benefit conferred by their payment of assessments in the City's original ULID included an ongoing right to priority over the non-ULID property owners who received the 850 units.

¶24 Because the record shows no impairment of contract, we need not address other theories advanced by appellants, all of which concededly depend on the validity of their theory of impairment of contract.

¶25 Affirmed.

GROSSE and KENNEDY, JJ., concur.